**UNITED STATES of America,
Appellee,**

v.

**George F. CABRAL, Defendant,
Appellant.**

**No. 72–1336.**

United States Court of Appeals,
First Circuit.

Heard Jan. 3, 1973.

Decided March 23, 1973.

Wayne P. Libhart, Brewer, Me., by appointment of the Court, with whom Joseph L. Ferris and Libhart & Ferris, Brewer, Me., were on brief, for appellant.

John B. Wlodkowski, Asst. U. S. Atty., with whom Peter Mills, U. S. Atty., was on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

McENTEE, Circuit Judge.

After trial by jury appellant, George F. Cabral, was convicted on a one count indictment for possession of a firearm which was not identified by a serial number in violation of 26 U.S.C. § 5861(i) (1970). On appeal he urges

that this conviction may not stand because he was denied a speedy trial and also because of an alleged deficiency in the government's proof. For the reasons set forth below, we find appellant's contentions to be without merit and affirm the conviction.

In order to evaluate appellant's speedy trial claim the underlying facts must be set forth in some detail. On October 4, 1970, State Police Sergeant Graves and Deputy Sheriff Goggin drove to a cabin located in a remote section of the Schoodic Lake region of Brownville, Maine, to investigate a report that parts from a stolen vehicle were being sold there. When the officers, who were dressed in plain-clothes and were driving an unmarked car, arrived at the camp, they approached appellant and one Martin Chase and asked them if they had any mag wheels for sale. After showing the officers some automobile parts inside the cabin, appellant said that he had some additional ones stored in the woods behind the camp. Before leaving the cabin, however, he pulled out the firearm in question, a shotgun which had both the barrel and butt sawed off, and announced that he was taking it along just "to keep things honest."

The foursome then proceeded down a woods road which ran alongside the camp. About seventy-five yards down the road a Chevrolet Corvette came into view. Before they reached the car, however, Sergeant Graves ordered appellant to freeze, identified himself as a police officer, and, after a brief struggle, placed him under arrest. When appellant asked why he had been arrested, Graves said for possession of the sawed-off shotgun "as openers." After the officers checked the engine number on the Corvette, they arrested appellant and Chase for possession of stolen property.

Thereafter appellant was transported to a local jail and eventually he was arraigned in state court on a charge of grand larceny. Approximately one month later he was transferred to a Connecticut state prison where he was held for past parole violations.[1] In the meantime, on October 7, 1970, the weapon in question was turned over to federal authorities. On January 18, 1972, some fifteen months later, appellant was indicted for possession of this weapon and in February 1972 a detainer warrant was served on prison officials in Connecticut. After being released on April 15, 1972, appellant was arraigned in Maine on this charge on May 3 and on May 18, through counsel, he moved to dismiss the indictment pursuant to Rule 48(b), Fed.R.Crim.P., on the basis of the pre-indictment delay. This motion was denied and in September trial and conviction followed.

In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court considered the sixth amendment speedy trial guarantee and refused to adopt an inflexible standard when dealing with claims based upon this provision. Rather, the Court mandated the use of an *ad hoc* balancing test in which the length of delay, the reason for the delay, the accused's assertion of his right, and the prejudice to the accused resulting from the delay, along with other relevant circumstances, were to be taken into consideration in analyzing speedy trial claims. No single factor was to be regarded "as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial . . . . [T]hese factors have no talismanic qualities; courts must . . . engage in a difficult and sensitive balancing process. [Footnote omitted.]" *Id.* at 533, 92 S.Ct. at 2193.

In applying this standard in the instant case, the first question which must necessarily be faced is the extent of the delay. As appellant points out, fifteen months elapsed between his arrest and the return of the indictment

---

1. Sometime after this transfer the grand larceny charge against appellant was dismissed.

and an additional eight months passed between indictment and trial. The government contends, however, that the fifteen month period should not be counted since the arrest for possession of the shotgun was a mere "temporary device" used to restrain appellant until the Corvette's engine number could be checked and he could be arrested for possession of stolen property. This argument is not persuasive.

In United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Court held:

> "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *Id.* at 320, 92 S.Ct. at 463.

In the instant case the testimony of Sergeant Graves unequivocally demonstrates that he arrested appellant for possession of the illegal firearm. The government's prosecution of this charge was initiated only three days later when, on October 7, 1970, state authorities turned over this weapon to a federal officer. Under these circumstances, regardless of the almost simultaneous arrest for possession of stolen goods, it is clear that appellant's right to a speedy trial crystallized at the time of his initial arrest. On the other hand, appellant's attempt to include the eight month period which passed between the return of the indictment and the time of his trial as a part of the claimed delay is equally impermissible. As the pretrial memorandum and the September 7, 1972, motion which he filed indicate, the basis for his attack on the indictment in the district court was that "there was unnecessary delay in presenting the charge against [him] to the grand jury from the time of the arrest . . . to the return of the

bill." When appellant's initial motion to this effect was presented at the pretrial hearing in May 1972, he made no demand for an immediate trial and did not object to having his case continued until September. Under these circumstances, appellant may not complain about any post-indictment delay. His claim is thus limited to the fifteen month period which passed between the time of his arrest and the return of the indictment.

▮ Turning next to the reasons for this delay, we note initially that since we consider only pre-indictment delay this is obviously not a case in which some portion of the delay may be attributed to appellant either as the result of difficulties he had in managing his defense or because he purposely chose to employ a dilatory tactic in meeting this charge. *See* United States v. Daley, 454 F.2d 505, 508–509 (1st Cir. 1972). On the other hand, as appellant recognizes, there is no evidence which indicates that the prosecution acted in any improper manner in order to hamper the preparation of his defense. In the absence of any plausible explanation by the government for its sloth in obtaining this indictment,[2] however, we conclude that this delay probably resulted from neglect. Delays of this sort, like those caused by over-crowded courts, although "more neutral" than intentional delays, are, of course, still viewed with disfavor. *Barker, supra,* 407 U.S. at 531, 92 S.Ct. 2182. *Cf.* Uviller, Barker v. Wingo: Speedy Trial Gets A Fast Shuffle, 72 Colum.L.Rev. 1376, 1386–87 (1972).

▮ With regard to appellant's obligation to assert his right, it is undisputed that he did not waive his claim as to the pre-indictment delay by his failure to move for the dismissal of the indictment until May 1972. Until he was indicted, he could not have known with

---

2. The government's attempt to explain the pre-indictment delay fell short when the Assistant United States Attorney, in explaining that there was no grand jury sitting in the Northern Division of Maine from April 1971 to January 1972, admitted that an indictment could have been obtained from the grand jury sitting in Portland during this period.

certainty that he was going to be prosecuted for this offense. Thereafter, as soon as he had been released from prison, he retained counsel and, having been apprised of the possibility of a speedy trial defense, moved to quash the indictment on that basis. In so doing, appellant acted with sufficient haste to preclude the possibility of waiver. *See* United States v. Butler, 426 F.2d 1275, 1278 (1st Cir. 1968).

A fourth factor to consider is the extent to which appellant has been prejudiced by this delay. In evaluating this *indicium*, reference must be made to the purposes which underlie the speedy trial provision which the Court in *Barker, supra*, 407 U.S. at 532, 92 S.Ct. at 2193 identified as the following: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. [Footnote omitted.]" In Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), the Court fleshed out the meaning of these factors as they apply to individuals who are incarcerated in one jurisdiction while charges are pending against them in another. With regard to factor (i), the Court noted that prejudice might result from the loss of the possibility of receiving "a sentence at least partially concurrent with the one [being served.]" In addition, the pendency of another charge might also cause an increase in the duration of the present imprisonment and a worsening of the conditions under which that sentence must be served. *Id.* at 378, 89 S.Ct. at 577. As to factor (ii), the Court recognized that a pending charge "can have fully as depressive an effect upon a prisoner as upon a person who is at large." *Id.* at 379, 89 S. Ct. at 577. Finally, as to factor (iii), the difficulties one faces in preparing his defense are obvious. "Confined in a prison, perhaps far from the place where the offense covered by the outstanding charge allegedly took place, [one's] ability to confer with potential defense witnesses, or even to keep track of their whereabouts, is obviously impaired." *Id.* at 379–380, 89 S.Ct. at 578. When appellant's claim is analyzed under these criteria, however, he fares none too well.

In the first place, with regard to the possibility that this charge increased the duration or exacerbated the conditions of appellant's prison stay, we note that here the detainer was not served on Connecticut prison officials until sometime after February 3, 1972, no more than two months before appellant was released. Given this circumstance, as well as the fact that appellant has not alleged that he suffered any privation in this regard, we may assume that the effects of this charge on the term and conditions of his imprisonment were minimal. Much the same may be said for any "anxiety or concern" which he may have suffered. Again he has not alleged nor is there any evidence in the record which indicates that he suffered any anxiety or public embarrassment as a result of this charge. As we observed in *Daley, supra*, 454 F.2d at 509,

"While at least some such adverse effects would appear inherent in every trial delay, where . . . there has been no allegation or evidence of any inconvenience, public embarrassment, or manifestation of prejudice the overall adverse effect can be assumed to be insubstantial."

Further, this has not been a case where pretrial delay has impaired the ability of the accused to defend himself. Appellant has not alleged that the delay in question caused him to lose contact with any potential defense witnesses. Also, unlike *Butler, supra*, the prosecution's case did not rest upon the testimony of lay eyewitnesses "which necessarily [becomes] less reliable with the passage of time." *Id.* 426 F.2d at 1277. The only witnesses who testified at trial were either state or federal officers and the underlying factual situation was both simple and straightforward. Finally, appellant's sole allegation of prejudice, that he lost a possible opportunity of receiving a sentence which would run concur-

rently with the term he was serving in Connecticut, is highly speculative and falls far short of a demonstration of actual prejudice. *See* McCrory v. Cook, 329 F.Supp. 83, 89 (N.D.Miss.1971), aff'd, 454 F.2d 1173 (5th Cir. 1972). The court in the instant case could have suspended sentence if it deemed appellant to have already served enough time. While such a decision is conceivably less likely than making a sentence concurrent with the one already being served, this possibility of prejudice alone cannot weigh heavily in the scales.

■ In balancing all of the factors discussed above in this case, we conclude that the trial court did not err in denying appellant's motion to quash the indictment. We are seriously disturbed by the government's delay in obtaining this indictment but, in the absence of a demonstration of any actual prejudice, we do not feel that the encroachment upon appellant's right to a speedy trial has been so egregious as to warrant the exercise of "the severe remedy of dismissal." *Barker, supra,* 407 U.S. at 522, 92 S.Ct. 2182. Our holding to this effect, however, should not be taken as an indication of any willingness on our part to condone delays of this sort. Were it not for the minuscule quantum of prejudice which we find in the instant record, our result might well be to the contrary.

■ Appellant's additional argument that the government was required, under the indictment, to prove that the weapon in issue was a sawed-off shotgun "intended to be fired from the shoulder" merits little discussion. The short answer to this contention is that Title 26 of the United States Code, under which he was indicted, does not contain any definition of "sawed-off shotgun," let alone a definition which would require that such a weapon be designed to be fired in a particular manner.[3] 26 U.S.C. § 5845(d), which defines "shotgun,"

does contain a provision that such weapons, *as originally manufactured,* must be designed to be fired from the shoulder and it is undisputed that the firearm which was taken from appellant fell within this definition *before* it was altered. Subsection (a)(2) of the same provision defines the word "firearm" as used in the indictment as follows: "a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length." Since appellant concedes that the weapon in question falls within this definition, the frivolity of his argument on this issue is clear.

Affirmed.

3. *Cf.* 18 U.S.C. § 921(a)(6), which provides:
"The term 'short-barreled shotgun' means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such a weapon as modified has an overall length of less than twenty-six inches."