**UNITED STATES of America,**

v.

**James T. BOUTHOT, Thomas P. Hughes, George P. Hughes, Kevin J. Brown, Roger G. Carr, Jr.**

Cr. No. 87–293–WF.

United States District Court, D. Massachusetts.

April 8, 1988.

---

Norman Zalkind, Boston, Mass., for Joseph T. Bouthot.

Paul V. Kelly, Boston, Mass., for U.S.

Jeffrey Smith, Boston, Mass., for Thomas P. Hughes.

H. Hoover Garabedian, Worcester, Mass., for George P. Hughes.

Kevin J. O'Dea, Boston, Mass., for Kevin J. Brown.

Charles McGinty, Susan Crockin, Federal Defender's Office, Boston, Mass., for Roger G. Carr, Jr.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. INTRODUCTION

The five defendants in this case are charged with being felons in receipt of firearms in violation of 18 U.S.C. § 922(h)(1). All except defendant Roger Carr, Jr. are also charged with being felons in possession of firearms in violation of 18 U.S.C.App. II § 1202(a), which for offenders with three prior convictions for robbery or burgulary involves a minimum mandatory fifteen year sentence. The defendants were prosecuted and incarcerated by the Commonwealth of Massachusetts for offenses arising out of the events alleged in the subsequent federal indictment in this case.

All of the defendants except George Hughes have moved to dismiss the indictment, alleging constitutional and other infirmities relating primarily to double jeopardy and their right to a speedy trial. After pre-hearing briefing, an extensive evidentiary hearing was held. This was followed by further briefing and oral argument.

For the reasons described below, the court has concluded that defendants' motions to dismiss should be denied.

### II. FINDINGS OF FACT

Upon consideration of the evidence presented, including the credibility of the witnesses, the court finds the following facts established by a preponderance of the evidence.

This case arises out of defendants' alleged involvement in events which occurred on September 4, 1986 in Holden, Massachusetts. On September 4, 1986, one or more individuals entered the home of Kenneth Holtgren, stole guns and jewelry worth more than one hundred dollars, and fled in a van. Shortly thereafter, the five defendants in this case were arrested by Holden police officers for violations of the laws of Massachusetts: breaking and entering in the day time with intent to commit a felony; larceny of property over $100; receiving stolen property over $100; and carrying a firearm without a license. A complaint reflecting these charges was obtained by Holden Detective Albert Bourget.

Within twenty-four hours of defendants' arrest, after determining the state charges independently, Bourget called Agent Douglas Wenner of the United States Bureau of Alcohol, Tobacco and Firearms (the "ATF"). Bourget called Wenner because he thought the federal government might be interested in prosecuting some or all of

the defendants under the new federal Armed Career Criminal statute, which imposes a mandatory minimum fifteen year sentence for a person convicted of receiving or possessing a firearm after having been previously convicted three times of robbery or burglary. See 18 U.S.C.App. II § 1202(a).

ATF is the federal law enforcement agency primarily responsible for investigating federal firearms cases. As such, it regularly works closely with state and local police, both assisting and receiving referrals from them. By such cooperation the federal government, in appropriate cases, contributes to the fight against violent crime, which is primarily a state and local responsibility.

The Armed Career Criminal statute was enacted in 1984. Its purpose is to segregate certain dangerous repeat offenders from society, and to deter others, by providing a mandatory minimum sentence much longer than the sentence ordinarily imposed in firearms cases in state or federal courts.

After the statute's enactment, the United States Attorney for the District of Massachusetts wrote a letter to many state and local law enforcement officials informing them of the law and asking them to advise ATF of cases which might be appropriate for investigation as potential federal Armed Career Criminal prosecutions. In addition, ATF agents explained the new statute to their state and local counterparts at their periodic meetings. Bourget had heard Wenner discuss the statute in the summer of 1986. This prompted Bourget's call after these defendants were arrested.

Wenner responded quickly to Bourget's call. After getting the police reports and Bourget's information concerning the defendants' criminal records, Wenner felt that the case was worthy of federal investigation and a good prospect for a federal Armed Career Criminal prosecution. Wenner told this to Bourget. They agreed that, to the extent it was up to them, they would like to see the state firearms charges dropped and federal firearms charges brought instead. They felt this was desirable in order to avoid the complications which they vaguely understood could arise from state and federal prosecutions of gun charges based upon the same incident. Wenner had often seen state gun charges dismissed in anticipation of a possible federal prosecution. Both Wenner and Bourget knew, however, that the state and federal prosecutors would each decide what charges would be pursued. More specifically, Wenner explained that an Assistant United States Attorney would have to decide whether to seek an indictment involving the minimum mandatory sentence provided by the Armed Career Criminal statute. The United States Attorney's Office had previously declined to seek indictments in some cases Wenner had recommended for prosecution.

Wenner opened a federal investigation of the defendants. This involved, among other things, interviewing eyewitnesses, seeking to find or speak to other individuals, tracing the guns' interstate nexus, compiling certified criminal records for each defendant, and acquiring fingerprint identifications to establish that the defendants were the individuals convicted of the offenses reflected on those criminal records.

Wenner's investigation was a federal investigation. It was not a joint investigation with state or local authorities. He did, however, receive assistance and cooperation from Bourget, who furnished information and documents, such as the relevant police reports. Wenner also conducted interviews of the victims in conjunction with Bourget, who had already established a relationship with them.

After learning of Wenner's interest in a possible Armed Career Criminal prosecution of defendants, Bourget asked the Assistant District Attorney then in charge of the state case, Neil Snyder, to dismiss the state gun charges. Snyder agreed to defer to the possible federal firearms prosecution and said he would dismiss the state firearms charges before trial. Snyder subsequently transferred the case to his colleague Thomas Landry, with a note that "the cases on carrying guns to be charged in [Federal Court]. Holden [Police Department] will speak to you about this." At all

times, however, Bourget and the Assistant District Attorneys involved were determined to pursue the other state charges against the defendants in order to vindicate the interests of the victims, who they felt were depending on them.

On October 16, 1986, Wenner went with Bourget to the Worcester Superior Court. The defendants were scheduled to go on trial that day. Wenner spoke briefly to Landry. He told Landry that he was conducting a federal investigation concerning the stolen guns which he expected would result in an Armed Career Criminal prosecution, involving a fifteen year mandatory minimum sentence. After the discussion, Wenner expected Landry would dismiss the state firearms charges.

Wenner had come to court primarily to speak with defendant Roger Carr. Wenner wanted to request Carr's cooperation in the federal investigation of Carr's co-defendants in the state case. It appeared to Wenner that Carr's record might not qualify him for Armed Career Criminal treatment. Thus, Wenner hoped to get Carr's testimony against the others in exchange for a more lenient sentencing recommendation in the possible federal case against him. Wenner explained this to Landry, who said he had no objection to Wenner speaking to Carr's attorney William Meehan. Landry then introduced Wenner to Meehan.

Wenner did not ask Landry not to inform the defendants of the federal investigation or of his interest in speaking to Carr. He hoped, however, that Landry would not do so because he felt that disclosure would injure his chances of obtaining Carr's cooperation.

On October 20, 1986, Wenner spoke briefly with Meehan, identifying himself as an ATF agent and explaining his interest in speaking with Carr. Meehan said that he would prefer Wenner wait until the conclusion of the state prosecution, when Meehan's representation of Carr would be over

and Wenner could approach Carr directly. Wenner accepted this response. He did not ask Meehan to keep their conversation confidential from Carr or his co-defendants. Meehan, however, apparently never told Carr of the conversation.[1] Indeed, Carr was not brought to court on October 20, 1986 and the trial was continued.

The trial was rescheduled for November 12, 1986. Prior to jury empanelment Landry attempted unsuccessfully to negotiate plea agreements with all of the defendants. He had not told them of his intention to seek dismissal of the gun charges in any event. Rather, he was using those charges as a bargaining chip. However, when those negotiations failed, before jury empanelment began, Landry told the judge that he wished to dismiss the gun charges and proceed to trial only on the other charges. Thus, when the jury was chosen and instructed, it was not informed of the gun charges.

After the jury was empaneled, court recessed until November 13, 1986. On November 13, 1986, plea negotiations resumed and agreements were reached which had the effect of providing for recommended sentences of less than a year to be served by each defendant on the state charges. Landry did not tell defendants' counsel of the federal firearms indictments he anticipated because he was concerned that disclosure would injure his opportunity to obtain pleas on the state charges. Each defendant's former counsel now says he would not have recommended his client plead guilty if he knew of the likely federal firearms charges, although a conviction on the state gun charges would have involved a minimum mandatory one year sentence.

The prospect of a federal prosecution for firearms violations made the plea agreement more palatable to Landry, but it was his understanding that the state gun charges had been dismissed the previous day, independent of the plea agreement. Although he anticipated a federal firearms

---

1. Meehan recalls meeting Wenner, but denies Wenner asked to speak to Carr. This contention is not credible. Meehan's failure to recall that Wenner wanted to solicit Carr's cooperation is, however, consistent with Meehan's testi-mony that he did not tell Carr of the federal investigation or of Wenner's interest in speaking to him. Carr did not testify in connection with the motions to dismiss.

indictment with the prospect of a lengthy minimum mandatory sentence, he insisted on guilty pleas and sentences on the remaining state charges primiarily because he felt the state had an important responsibility to the victims and to other citizens, but also because he felt a federal prosecution was not assured.

After the guilty pleas were negotiated, the judge engaged in a colloquy with each of the defendants. Each defendant waived his right to a jury trial and said he wished to plead guilty. Landry then read the relevant police reports. Each defendant, in turn, acknowledged the substantial accuracy of the information concerning him.[2] The judge then directed the clerk to enter findings of guilty for each defendant on the charges of breaking and entering to commit a felony and larceny of property over $100. The judge dismissed the charge of receiving stolen property over $100. On the charge of carrying a firearm without a license, the court declared for each defendant "not guilty, discharged." The judge then sentenced each defendant to the term of incarceration recommended by Landry.

The sentences recommended by the government and imposed by the state court were legitimate actions to punish each defendant for the state offenses for which he was convicted. The sentences were not, in whole or in part, an effort to serve the interests of the federal government. Indeed, the court did not know of the federal interest in the defendants when the sentences were imposed.

Landry felt it was an error for the court to declare the defendants not guilty of the gun charges because they were to have been dismissed before trial. As he explained to Bourget, however, he believed the judge's action was the functional equivalent of a dismissal. Thus, he did not bring the matter to the court's attention.

Wenner was out of state on November 12 and 13, 1986. When he returned on November 20, 1986, Bourget told him that the state gun charges had been dismissed, and the defendants had pled guilty to the other state charges and had been sentenced.

On November 20, 1986, Wenner also found he had received the fingerprint reports, which were the last items he needed to complete his investigation. He then drafted his report. As there was no secretary in the Worcester office where Wenner worked, the report was sent elsewhere for typing. When Wenner was satisfied with it, it was reviewed by his supervisor in Worcester and forwarded to Boston for consideration by the Special Agent in Charge (the "SAC"). In due course, the SAC approved the report and transmitted it to the U.S. Attorney's Office in January, 1987. The ATF investigation was pursued diligently and the ATF report was prepared as promptly as possible. Neither was delayed for any purpose.

When the ATF report arrived in the U.S. Attorney's office, it was sent to Assistant U.S. Attorney Kevin Driscoll, who usually handled ATF cases, among others. Driscoll, however, had recently been assigned to try a massive case against several alleged terrorists. The U.S. Attorney's office intended to reassign his usual work, but was understaffed. Although Wenner called several times to see who would be evaluating his report, the only action prior to July, 1987 was a review by another Assistant U.S. Attorney who specialized in issues of law to address a legal question unrelated to the dual prosecution aspect of this case.

The case was not treated as a priority in the busy U.S. Attorney's Office. Rather, in due course, sometime in late June, 1987, it was assigned to a newly hired Assistant U.S. Attorney, Paul Kelly. Kelly reviewed the report and recommended seeking an indictment including Armed Career Criminal charges against all of the defendants except Carr. Kelly's supervisors agreed. The indictment in this case was returned on August 31, 1987. At that time the prosecu-

---

**2.** Because, among other things, it is not clear in the change of plea colloquy that any defendant acknowledged possession of a firearm, this court has granted defendants' motions *in limine* to preclude their statements in state court from being introduced at the trial of this case.

tor understood the state gun charges had been dismissed.

There was no effort by the U.S. Attorney's office to delay the indictment in this case to obtain a tactical advantage or for any other improper reason. Rather, the passage of time between receipt of the ATF report and seeking an indictment resulted solely from the ordinary operation of a busy office and the fact that this matter was not treated as an especially high priority.

Prior to the federal indictment all of the defendants except Carr had been released from state custody. No federal detainers had been placed on them. Thomas Hughes got married shortly after his release. He and his wife have recently had their first child.

The federal government did not gain any tactical advantage by the passage of time between the state arrests and the federal indictments. Thomas Hughes' counsel suggested that several witnesses whose testimony would be helpful to Hughes are now unavailable. However, the evidence indicates that one witness, Kevin Brady, disappeared in September, 1986 and would not have been accessible if this case had been indicted earlier. Hughes has an address for the other allegedly missing witness, Marty Bouthelier, and did not establish that Bouthelier is now unavailable to testify. In addition, it has not been shown that co-defendant Roger Carr, Jr. would have testified, or testified favorably to Hughes, if this federal case had been indicted earlier.

At the Detention Hearing in this case on October 9, 1987, the federal government learned for the first time that findings of not guilty had been entered on the state firearms charges. The Department of Justice requires special authorization of indictments in certain cases involving dual prosecutions. While this authorization is usually requested before an indictment is sought, it may be obtained at any time before trial. Since they believed the state firearms charges had been dismissed, the federal prosecutors did not initially believe that Department of Justice authorization for a

dual prosecution was required. Upon learning of the not guilty findings, however, they requested and received Department of Justice authorization for this case.

In summary, the court concludes that this is a matter in which state and federal authorities have operated as separate sovereigns, to enforce their own laws, and to vindicate their respective interests. The state and federal authorities did cooperate. Bourget assisted Wenner in the federal investigation. In addition, the state authorities considered the interests and anticipated actions of the federal government in deciding not to pursue the state firearms charges. The state authorities, however, at all times acted of their own volition to satisfy the state's interest in the defendants. The state authorities were not controlled by the federal government. Indeed, the federal and state prosecutors who decided the charges each sovereign would pursue had no contact until the filing of the motions to dismiss now being decided.

Nor did the federal government seek to use state processes to accomplish anything. The U.S. Attorney's Office did not learn of this matter until several months after the state proceedings had concluded. Until the Detention Hearing on October 9, 1987, the federal authorities, who were not present on November 13, 1986, believed the state firearms charges had been dismissed. The federal government was not represented by, or in privity with, the state prosecution. It would not have been reasonable for the federal government to expect that it would be precluded from relitigating any issue decided in the state proceedings.

In short, the evidence demonstrates that this is a case in which representatives of separate sovereigns, with a mutual interest in the defendants, cooperated in pursuing their respective cases without surrendering their autonomy.

## III. CONCLUSIONS OF LAW

### A. *Double Jeopardy and Related Claims*

Defendants claim that this federal indictment should be dismissed because it sub-

jects them to double jeopardy and violates the Department of Justice's internal guidelines regarding dual prosecutions. Alternatively, defendants ask the court to find that the federal government is collaterally estopped from asserting that defendants, individually or jointly, possessed any firearms because the federal government allegedly participated in the state proceedings in which defendants assert it was found that they did not possess firearms. For the reasons explained below, defendants' claims are without merit.

### 1. *Double Jeopardy*

Defendants contend that this federal prosecution is barred by the Fifth Amendment of the United States Constitution which provides that no person shall "be subject for the same offense to be put twice in jeopardy of life or limb." This contention, however, is not correct.

First, it is doubtful that the defendants were put in jeopardy with regard to the state gun charges. "In the case of a jury trial, jeopardy attaches when the jury is empaneled and sworn [and] in a nonjury trial, jeopardy attaches when the court begins to hear evidence." *Serfass v. United States,* 420 U.S. 377, 388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265 (1975). *See also United States v. Romero,* 836 F.2d 39, 42 (1st Cir.1987). In this case, the government requested dismissal of the state gun charges before the jury was empaneled and the jury, when instructed, was not informed of those charges. Similarly, the change of plea colloquy does not appear to have been a non-jury trial involving the presentation of evidence.

■ Nevertheless, the court recognizes that after the change of plea, the judge declared with regard to each charge of carrying a firearm without a license "not guilty, discharged." This language suggests that jeopardy did attach concerning the state charges of carrying a firearm without a license. It is not, however, necessary to resolve the issue of whether jeopardy attached in the state prosecution, which may turn on nuances of state law and practice. Even assuming that jeopardy attached concerning the state firearms charges, this federal prosecution does not subject defendants to double jeopardy.

"Successive prosecutions are barred by the Fifth Amendment only if the two offenses for which the defendant is prosecuted are the 'same' for double jeopardy purposes." *Heath v. Alabama,* 474 U.S. 82, 87, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985). "Separate statutory offenses with different aims, each requiring proof of a fact not required by the other, are not the same offenses for the purposes of double jeopardy." *U.S. v. Lopez Adino,* 831 F.2d 1164, 1167 (1st Cir.1987).

In addition, "successive prosecutions are not prohibited by the Fifth Amendment if they are brought by separate sovereigns." *Id.* at 1167. " 'The dual sovereignty doctrine is founded on the common law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the "peace and dignity" of two separate sovereigns by breaking the laws of each, he has committed two distinct "offenses" ' and is subject to punishment for both." *Id.* at 1167, *quoting Heath,* 474 U.S. at 88, 106 S.Ct. at 437.

■ In this case, the state charge of carrying a firearm without a license in violation of M.G.L. c. 269, § 10 and the federal charge of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(h)(1) and 18 U.S.C.App. II § 1202(a) are separate statutory offenses. To prevail on the federal charges the government must establish not only possession of a firearm, but also each defendant's status as a convicted felon and that the gun in question travelled in interstate commerce. Neither a prior conviction nor an interstate nexus are elements of the separate, state offense.

The different elements of proof required to establish the state and federal offenses are distinctions reflecting a substantive difference in the aims of the federal and state statutes. The state statute covers all unlicensed carrying of firearms. The federal statute, however, applies only to convicted felons, evidencing a special concern about the danger presented by convicted criminals who improperly carry guns. Thus, the

state and federal firearms charges do not constitute the same offense for double jeopardy purposes.

In addition, this federal prosecution does not constitute double jeopardy because, in the circumstance of this case, Massachusetts and the United States are separate sovereigns. The Supreme Court "has uniformly held that the States are separate sovereigns with respect to the Federal Government ... because each State's power to prosecute is derived from its own 'inherent sovereignty' not from the Federal Government." *Heath,* 474 U.S. at 89, 106 S.Ct. at 437 (citations omitted).

Consistent with this concept, however, the Supreme Court has indicated that successive prosecutions would be barred if the state "was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal" and the second prosecution was thus "a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution." *Bartkus v. Illinois,* 359 U.S. 121, 123–24, 79 S.Ct. 676, 678, 3 L.Ed.2d 684 (1959).

As stated by the Court of Appeals for the District of Columbia Circuit, "*Bartkus* stands for the proposition that federal authorities are proscribed from manipulating state processes to accomplish what they cannot themselves constitutionally accomplish.... The burden, however, of establishing that federal officials are controlling or manipulating the state process is substantial: the [defendant] must demonstrate that state officials had little or no independent volition in the state proceedings." *United States v. Liddy,* 542 F.2d 76, 79 (D.C.Cir.1976). *See also United States v. Ng,* 699 F.2d 63, 68 (2d Cir.1983) (Absent any finding that "the state of Massachusetts acted as a tool of the federal government in filing the state charge ... or in negotiating a plea agreement with them, it cannot be said that the federal prosecutor accepted any responsibility for the conduct of the state ..."); *United States v. Bassford,* 812 F.2d 16, 21 (1st Cir.) *cert. denied,* — U.S. —, 107 S.Ct. 1909, 95 L.Ed.2d

514 (1987) ("The federal government was not a 'tool' of the state as that term was employed by the *Ng* court.").

■ The cases are clear—and in this court's view correct—in recognizing that cooperation between federal and state law enforcement officials in matters in which concurrent jurisdiction exists is insufficient to render a state a mere tool of the federal government for double jeopardy purposes. Thus, in *Bartkus,* the Supreme Court found that it was permissible for the Federal Bureau of Investigation, after an acquittal on federal charges, to conduct additional investigation and turn over all of its evidence to state authorities for use in a successful state prosecution arising out of the events which generated the prior federal case. *Bartkus,* 359 U.S. at 122, 79 S.Ct. at 677. This cooperation did not constitute double jeopardy because "[t]he record [established] that the prosecution was undertaken by state prosecuting officials within their discretionary responsibility and on the basis of evidence that conduct contrary to the penal code of Illinois had occurred within their jurisdiction." *Id.*

A comparable result relating to cooperation was reached in *Heath.* In *Heath,* Georgia and Alabama authorities cooperated in a dual investigation of a kidnapping and murder case. Georgia prosecuted the defendant first. Faced with a possible sentence of death under Georgia law, the defendant pled guilty in exchange for a sentence of life imprisonment, which might have resulted in his serving only seven years in prison. *Heath,* 474 U.S. at 84, 106 S.Ct. at 435. Georgia officials later played leading roles as prosecution witnesses in the Alabama trial. *Id.* at 102, 106 S.Ct. at 444 (Marshall, J. dissenting). The defendant was convicted and sentenced to death. *Id.* at 85–86, 106 S.Ct. at 435–36. Notwithstanding the cooperation of Georgia officials in the dual investigation and their roles as witnesses in the Alabama prosecution, the two states were deemed separate sovereigns for double jeoparday purposes. *Id.* at 93, 106 S.Ct. at 439.

The degree of cooperation between the federal and state authorities in this case

has not exceeded the cooperation allowed in *Heath* or *Bartkus*. The federal government did obtain information and assistance from the state authorities. The federal government did not, however, dominate the state authorities or use the state as a tool to serve federal purposes. The state's decision to drop its firearm's charges was influenced by the action it anticipated, but was not assured, that the federal government would take. This, however, does not mean the state was a tool of the federal government. *See Liddy,* 542 F.2d at 80 (heeding recommendation of federal Special Prosecutor to dismiss a state prosecution does not render the state a "tool" of the federal government for Sixth Amendment speedy trial purposes). Rather, while the state authorities considered the interests and anticipated activities of the federal government, the state authorities at all times acted of their own volition, with a view to vindicating important state interests.[3]

The court, therefore, views this case as a reminder that we live in a nation in which the state and federal governments share law enforcement responsibilities. In some areas their jurisdictions overlap. Each level of government has limited resources. Effective and efficient law enforcement requires communication, cooperation, and coordination. As Justice Felix Frankfurter, himself a former federal prosecutor, recognized with approval, for "federal officials [to act] in cooperation with state authorities is ... conventional ... throughout the country." *Bartkus,* 359 U.S. at 123, 79 S.Ct. at 678. The proper parameters of this important convention were not exceeded in this case. Thus, this federal prosecution does not subject the defendants to double jeopardy.

### 2. *Issue Preclusion*

Defendants argue that if this federal prosecution is not dismissed on double jeop-

ardy grounds, the federal government is precluded from litigating the issue of possession of firearms because this issue was determined in the state court and the federal government is bound by that determination. This argument, however, is also unavailing.

The Court of Appeals for the First Circuit has not yet decided whether in criminal proceedings collateral estoppel, more correctly characterized as "issue preclusion," is required by due process when an issue has been decided before jeopardy attached. *United States v. Romero,* 836 F.2d at 42–44. However, assuming jeopardy did not attach with regard to the state firearms charges, it is not necessary for this interesting constitutional issue to be decided in this case.

As a threshold matter, it is uncertain whether the issue of possession of firearms was litigated at all in the state proceedings. The firearms charges were to be dropped before the jury was empaneled. In addition, the court has already granted defendant's motion *in limine* to exclude in this case their alleged admissions to possessing firearms in the state change of plea colloquy because the relevant statements are so ambiguous. *See supra* note 2. Thus, it is not certain that the state itself would be precluded from reinstituting and litigating its firearms charges.

■ Moreover, as in *Romero,* the United States may not be "fairly considered to have had its day in court." *Romero,* 836 F.2d at 43. More specifically, the United States was not in privity with the state in its prosecution of these defendants. The United States was not a party to the state action, did not control it, and was not represented in the state case. No representative of the federal government was in the state

---

**3.** It has been held that when federal and state authorities have both instituted prosecutions as the result of the same conduct, "there is nothing more than exercise of normal prosecutorial discretion involved if the prosecuting attorney is satisfied to drop one prosecution if an adequate result is obtained in the other, or decides to proceed in the second case if an inadequate result is obtained in the first." *United States v.*

*DiMichael,* 692 F.2d 1059, 1062 (7th Cir.1982) *cert. denied,* 461 U.S. 907, 103 S.Ct. 1878, 76 L.Ed.2d 809 (1983). Similarly, it was "nothing more than the normal exercise of prosecutorial discretion" for the state prosecutor in this case to dismiss the state firarms charges in anticipation of a federal prosecution with the potential to result in longer sentences.

court on November 12 or 13, 1986. Nor did any federal official have any reason to believe that the state court proceeding would decide any matters affecting the possible federal prosecution. To the contrary, Agent Wenner was under the impression that the state firearms charges were to be dismissed to avoid any complications arising from conceivable claims of double jeopardy. The U.S. Attorney's office was not even aware of the matter until months after the conclusion of the state proceedings. Under these circumstances, the concept of issue preclusion is not applicable to this case. *Romero* 836 F.2d at 42–44.

### 3. *The Petite Policy*

The defendants also ask that this case be dismissed because they claim it violates the Department of Justice's dual prosecution policy. The Department of Justice, however, has complied with its dual prosecution policy, which does not in any event establish litigable rights on which defendants may rely.

The so-called *Petite* policy, deriving from *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960), was instituted by the Department of Justice largely as a measure to minimize any potential abuse arising out of the power of the state and federal governments to prosecute individuals for the same conduct, since double jeopardy principles do not ordinarily apply to such dual prosecutions. *See Rinaldi v. United States*, 434 U.S. 22, 28, 98 S.Ct. 81, 84, 54 L.Ed.2d 207 (1977). The policy "precludes the initiation or continuation of a federal prosecution following a state prosecution based on substantially the same act or acts unless there is a compelling federal interest supporting the dual prosecution." Department of Justice Manual, Title 9, § 2.142(A), at p. 172. Relevant to the present case, and as amplification as to what is considered a "compelling federal interest," the policy goes on to provide that a dual prosecution will be authorized if "the state proceeding left substantial federal interests demonstrably unvindicated" and specifically, where "an enhanced sentence in the federal prosecution is anticipated." *Id.* § 2.142(A)(3) at p. 175.

The defendants do not challenge the fact that the Department of Justice has authorized this prosecution under the provisions of its internal policy. They contend, however, that this authorization was not obtained prior to initiation of the federal indictment. On this point, the policy is clear:

> A failure to obtain prior authorization of a dual prosecution will result in a loss of any conviction through dismissal of the charges *unless* it is later determined that there was in fact a compelling federal interest supporting the prosecution and a compelling reason to explain the failure to obtain prior authorization.

*Id.* § 2.142(a) at p. 172. (emphasis added)

> ... authorization ... must be obtained before *a trial may be commenced* or a guilty plea accepted on federal charges based on substantially the same act or acts.

*Id.* § 2.142(a) at p. 173. (emphasis added).

Thus, the policy is satisfied as long as authorization from the appropriate Assistant Attorney General is obtained, prior to commencement of trial, and not simply prior to indictment. *Accord United States v. Frederick*, 583 F.2d 273, 274 (6th Cir. 1978) *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 80 (1979). In this case, this has been done.

More importantly, even if there had been a violation of the *Petite* policy in this case, a defendant does not have a right to enforce the policy. The Supreme Court has recognized that this policy is "not constitutionally mandated." *Rinaldi*, 434 U.S. at 29, 98 S.Ct. at 85. Several Circuit courts, including the Court of Appeals for the First Circuit, have therefore held that the *Petite* policy does not create any substantive or due process rights which a criminal defendant may invoke against the government. *See United States v. Booth*, 673 F.2d 27, 30 (1st Cir.) *cert. denied*, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982) ("The [*Petite*] doctrine does not create a corresponding right in the accused"); *United States v. Schwartz*, 787 F.2d 257, 267 (7th Cir.1986) ("[t]he Department of Justice may give such weight as it chooses to its

internal rules"); *United States v. Robinson*, 774 F.2d 261, 275 (8th Cir.1985) ("... even a genuine failure ... to follow the *Petite* policy does not create a right that a defendant can invoke to bar federal prosecution").[4]

Accordingly, defendants' request that this case be dismissed because of an alleged failure of the Department of Justice to adhere to its dual prosecution policy must be denied.

### B. *Pretrial Trial Delay*

The defendants assert that the passage of almost a year between their arrests by state authorities and the federal indictment in this case violated their Fifth Amendment right to Due Process and Sixth Amendment right to a speedy trial, thus requiring dismissal. Alternatively, they contend that the indictment should be dismissed pursuant to Federal Rule of Criminal Procedure 48, which authorizes dismissal if there is unnecessary delay in seeking an indictment or in bringing a defendant to trial. As described below, however, these claims are not persuasive.

#### 1. *Due Process*

■ Defendants have failed to establish that their Fifth Amendment rights to Due Process have been violated by the passage of time between their arrest by state authorities and the federal indictment in this case because it has not been shown that the delay has substantially prejudiced their right to a fair trial, or that it was the result of an intentional effort by the government to gain a tactical advantage.

The Supreme Court has held that the government is not obliged to file charges as soon as probable cause exists, or as soon as it believes it could prove those charges beyond a reasonable doubt. *United States v. Lovasco*, 431 U.S. 783, 791–92, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977); *United States v. Picciandra*, 788 F.2d 39, 42 (1st

Cir.) *cert. denied,* — U.S. —, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986). Rather, a prosecutor has discretion concerning when to seek an indictment. This "discretion is limited only by the requirement that it not violate those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *United States v. Ciampaglia,* 628 F.2d 632, 639 (1st Cir.) *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980) *quoting Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2048–49. *See also Picciandra,* 788 F.2d at 42.

"To prove a. delay violated those 'fundamental conceptions of justice' a defendant must prove that (1) preindictment delay caused substantial prejudice to his right to a fair trial and, (2) the Government intentionally delayed indictment in order to obtain a tactical advantage over the accused." *Picciandra,* 788 F.2d at 42 (citations omitted). This imposes a "heavy burden" on a defendant. *United States v. Marler,* 756 F.2d 206, 213 (1st Cir.1985). In this case the defendants have not established either essential element of a Due Process claim.

The only cognizable prejudice for the purposes of Fifth Amendment Due Process analysis is harm to the right to a fair trial. *Lovasco,* 431 U.S. at 796–97, 97 S.Ct. at 2051; *United States v. Acevedo,* 842 F.2d 502, 504 (1st Cir.1988); *Picciandra,* 788 F.2d at 42; *Marler,* 756 F.2d at 213. Personal prejudice, which is relevant to Sixth Amendment and related speedy trial issues, is not relevant to a Due Process claim.

In this case, defendants have not shown any prejudice to their right to a fair trial caused by the passage of time between their state arrests and their federal indictment, let alone "substantial prejudice" to that right. The only specific contention of cognizable prejudice was Thomas Hughes' claim that several witnesses who would be helpful to him are no longer available.

---

**4.** Federal investigators and prosecutors at times oppose the promulgation of Department of Justice standards and procedures requiring high level authorization to employ sensitive law enforcement techniques on the basis that such guidelines would generate ponderous litigation, with the potential to frustrate important investi-

gations and prosecutions. The fact that internal Department of Justice policies, like the *Petite* policy, do not create rights enforceable by defendants facilitates the implementation of guidelines designed to prevent federal law enforcement actions which may be legally permissible, but inappropriate in certain circumstances.

However, one witness, Kevin Brady, disappeared shortly after defendants' arrest in September, 1986. Thus, he would not have been available to testify even if defendants had been indicted earlier. Hughes has an address for the other purported missing witness, Marty Bouthelier, and did not establish he is now unavailable to testify. Similarly, the evidence does not establish that codefendant Roger Carr, Jr. would have testified, and testified favorably to Hughes, if this federal case had been instituted earlier.

In addition, the passage of time between the state arrests and the federal indictment was not the result of an intentional effort to obtain a tactical advantage over the defendants. Thus, the second essential element of a valid Due Process claim is also lacking.

Thomas Hughes argues, however, that the Supreme Court in *Lovasco* indicated that Due Process may require dismissing prosecutions where delays resulted from "various prosecutorial decisions—such as assignment of manpower and priorities among investigations of known offenses ..." *See* 431 U.S. at 797 n. 19, 97 S.Ct. at 2052 n. 19. This argument, however, is based upon a misreading of *Lovasco*. The footnote in *Lovasco* on which Hughes relies relates to the Supreme Court's statement that "[s]o few defendants have established that they were prejudiced by delay that neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay." 431 U.S. at 796–97, 97 S.Ct. at 2052. In the corresponding footnote, "assignment of manpower and priorities among investigations" were merely cited by the Court as "some of the noninvestigative reasons for delay." *Id.* at n. 19, 97 S.Ct. at n. 19.

Thus, the Supreme Court did not suggest that the assignment manpower and investigative priorities are to be considered improper motives for Due Process analysis. Rather, these factors were among the foreseeable circumstances that caused the Court to state, "We therefore leave to the lower courts, in the first instance, the task of applying the settled principles of due process ... to the particular circumstances of individual cases." *Id.* 431 U.S. at 797, 97 S.Ct. at 2052.

In the view of this court, even assuming *arguendo* that defendants demonstrated substantial prejudice to their right to a fair trial, it would be inappropriate to dismiss on Due Process grounds because the preindictment delay at issue was caused by the assignment of manpower, reflecting the priority of investigations established by the U.S. Attorney's office. There are, unfortunately, more violations of federal law than the government can investigate and prosecute. Some discretion is required. The establishment of law enforcement priorities is an executive function, not a judicial function. Indeed, such priorities are often major issues in Presidential campaigns.

It would not only be inappropriate, but also injurious to the administration of justice if the operation of executive law enforcement priorities and related allocations of manpower became litigable issues. In *Lovasco*, the Supreme Court noted that "if courts were required to decide in every case when the prosecution should have commenced, it would be necessary for them to trail the day-by-day progress of each investigation. Maintaining daily records would impose an administrative burden on prosecutors, and reviewing them would place an even greater burden on the courts." 431 U.S. at 793–4, n. 14, 97 S.Ct. at 2050 n. 14. If, as Hughes contends, the effects of law enforcement priorities and manpower allocation presented litigable issues, the court would have to consider each case in the context of all concurrent investigations—some of which are likely to be highly confidential—and prosecutions. This would be particularly onerous and inappropriate.

The court respectfully suggests that these considerations illuminate the wisdom of the Supreme Court's observation that, "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." *Id.* at 790, 97 S.Ct. at 2049. Thus,

Hughes' claim that the good faith operation of prosecutorial priorities and assignments of manpower may provide an essential element of a Due Process violation is not persuasive.

### 2. *Sixth Amendment*

■ Defendants also contend that this federal prosecution is barred by the Sixth Amendment which provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial." This argument is premised upon the assumption that the state's actions concerning the defendants are attributable to the federal government for speedy trial purposes. This assumption, however, is incorrect.

"No Sixth Amendment right to a speedy trial arises until charges are pending." *Marler*, 756 F.2d at 210, *quoting United States v. MacDonald*, 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982). As the First Circuit has recognized, the Supreme Court stated in *MacDonald* that, " 'of course an arrest or indictment by one sovereign would not cause the speedy trial guarantee to become engaged as to possible subsequent indictments by another sovereign.' " *Marler*, 756 F.2d at 211, *quoting MacDonald*, 456 U.S. at 10, n. 11, 102 S.Ct. at 1503, n. 11.

■ Therefore, at least ordinarily, a state charge does not trigger the federal constitutional right to a speedy trial on federal charges. *Marler*, 756 F.2d at 211. However, because this question implicates the "very concerns that led the Court to formulate the dual sovereignty doctrine in the double jeopardy area," *id*, it appears that the Court of Appeals for the District of Columbia Circuit correctly concluded that action by state oficials may be attributed to the federal government for Sixth Amendment speedy trial purposes if the defendant demonstrates that the state prosecution is "merely a tool of the federal authorities" and "that the state officials had little or no independent volition in the state proceedings." *Liddy*, 542 F.2d at 79; *see also United States v. Bassford*, 812 F.2d 16, 20–21 (1st Cir.1987) (the concept of vindictive prosecution by two separate sovereigns requires a finding that the government was a "tool" of the other). As described in detail earlier, however, the defendants have not made this showing in this case.

The defendants, however, maintain that this case is analogous to *United States v. Cabral*, 475 F.2d 715 (1st Cir.1973), and therefore ought to be dismissed. In *Marler*, the First Circuit described the relevant facts of *Cabral* as follows:

In *Cabral*, state officers arrested the defendant for possession of a sawed-off shotgun while investigating him for the sale of stolen property. Three days after the arrest, state authorities turned the weapon over to a federal officer. Cabral was indicted in state court for grand larceny, and 15 months later, was indicted on federal weapons charges. In response to Cabral's claim that his sixth amendment rights had been violated, the federal government argued that the 15–month delay should not be counted because the arrest for possession of the shotgun was merely a "temporary device" used by state authorities to hold Cabral until further evidence regarding his sale of stolen property could be gathered. *Id.* at 718.

The court rejected this argument, finding that Cabral's arrest was "unequivocally" for possession of an illegal firearm and that "[t]he [federal] government's prosecution of this charge was initiated only three days later when ... state authorities turned over this weapon to a federal officer." *Id.* The court considered the prompt surrender of the weapon to federal custody and the arrest on the *same charges* later prosecuted in federal, not state, court to have converted the initial arrest into a federal "accusation" on weapons charges for sixth amendment purposes.

*Marler*, 756 F.2d at 212.

As recognized by the First Circuit in *Marler*, it is questionable whether the limited exception to the general rule described in *Cabral* survives the Supreme Court's decision in *MacDonald*. *Id.* ("Assuming, but without deciding, that this exception to the general rule survives MacDonald ...").

In any event, this court respectfully suggests that, as indicated earlier, any limited exception to the principal that state actions are not attributable to the federal government would be properly defined by the standards established by *Bartkus*, which were applied to a Sixth Amendment claim in *Liddy*. It is not, however, necessary to resolve this issue in this case because even if *Cabral* remains a correct statement of the law, it does not justify dismissal of this case.

In this case, the initial arrest was based solely on state charges. As described earlier in the discussion concerning double jeopardy, the state charges, including the firearms charges, were distinct from the federal charges now at issue. The court recognizes that as in *Cabral*, and in contrast to *Marler*, the federal government was promptly advised of this matter and the federal investigation began immediately. At no time, however, were any of the state charges "merely a 'temporary device'" used by state authorities to detain the defendants and to facilitate the federal investigation. *Compare Cabral*, 475 F.2d at 718. Rather, the state in this case was at all times acting in good faith to vindicate its own, legitimate interest in the defendants.

In addition, even if it is assumed that the defendants were charged with some federal crimes by the state's actions, those charges were resolved for speedy trial purposes by the November, 1986 dispositions in the state court. As the First Circuit said in *Marler*, in language applicable here:

> Even if we were somehow to find that [defendant] stood "accused" of his federal crime at the time of his state indictment, *United States v. MacDonald* indicates that the accusation was put to rest for sixth amendment purposes by [his] state court conviction. In deciding that "[a]ny undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause," the *MacDonald* Court emphasized that the speedy trial guarantee is designed primarily to prevent the deleterious personal effects that prolonged, unresolved public accusations may cause. *Thus, it is the pendency of the untried charges that is the focus of sixth amendment analysis. It follows that where a charge is resolved either by dismissal (as in MacDonald), acquittal, or conviction (as in the instant case), the speedy trial guarantee is no longer applicable.* At that point, the formerly accused is, at most, in the same position as any other subject of a criminal investigation. Certainly the knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life.... But with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending. *MacDonald*, 456 U.S. at 8-9, 102 S.Ct. at 1502.

*Marler*, 756 F.2d at 213, n. 4 (emphasis added). Thus, the resolution of the state charges on November 13, 1986 extinguished any of the constitutional speedy trial considerations which defendants contend were generated by the state arrests.

Defendants claim, however, that this case is distinguishable from *MacDonald* because they, unlike MacDonald, were convicted and incarcerated as a result of the original state charges. Thus, they assert that speedy trial considerations continued to be implicated during their incarceration. However, the First Circuit addressed this claim too in *Marler*. In this case, as in *Marler*, the sentences imposed in the state proceedings were legitimate actions to punish each defendant for the state offenses for which he was convicted, rather than efforts to serve the interests of the federal government. Therefore, as in *Marler*:

> [Defendants'] distinction between dismissal and conviction [is] untenable. Any negative consequences of [their] state conviction[s] flowed not from the pendency of any federal accusation, but rather from the state court ... determination that [defendants] had violated the law and should be punished for it. The federal judicial system should not also be punished for [defendants] conviction[s].

In view of the foregoing, defendants have not presented a valid Sixth Amendment claim for dismissal.

### 3. *Rule 48*

Defendants strenuously argue that this case should be dismissed pursuant to Federal Rule of Criminal Procedure 48(b) which authorizes, but does not require, dismissal by the court "if there is unnecessary delay in presenting the charge to a grand jury ... or if there is unnecessary delay in bringing a defendant to trial." In this case, however, dismissal pursuant to Rule 48(b) would be inappropriate.

▆ The court's power to dismiss under Rule 48(b) for unnecessary delay is not limited to those situations in which the Sixth Amendment right to a speedy trial has been violated. *United States v. Correia*, 531 F.2d 1095, 1099 (1st Cir.1976). Rather, the Rule is an expression of the inherent power of the court to dismiss for want of prosecution. *Id.*

▆ The Supreme Court, however, has stated that, "the rule clearly is limited to post-arrest situations." *United States v. Marion*, 404 U.S. 307, 319, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). *See also Lovasco*, 431 U.S. at 789, n 8, 97 S.Ct. at 2048, n. 8. As described in detail earlier, it is not appropriate to attribute the state arrest of the defendants to the federal government. Thus, the eleven months between that arrest and the federal indictment is not cognizable for Rule 48 purposes and there is no basis for a dismissal under Rule 48.[5]

▆ In the interest of completeness, however, the court has considered whether dismissal would be appropriate if Rule 48 were applicable. In this case, dismissal would not be justified.

In determining whether to exercise its discretionary power to dismiss under Rule 48(b), the court may consider the same factors relevant to a constitutional decision regarding denial of a speedy trial. *United States v. Rowbotham*, 430 F.Supp. 1254, 1257 (D.Mass.1977); *United States v. Judge*, 425 F.Supp. 499, 503 (D.Mass.1976). In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court identified four factors which should be considered in determining whether a defendant has been deprived of his right to a speedy trial: 1) the length of delay; 2) the reason for the delay; 3) the defendant's assertion of his right, and 4) prejudice to the defendant.

Two of these factors are not in dispute in this case. The defendants have asserted their right to a speedy trial. The length of time between their arrests by the state and the federal indictment was slightly less than one year. The implications of the other relevant factors are disputed.

Part of the delay between the state arrest and the federal indictment is attributable to the conduct of the ATF investigation and the preparation of the report recommending prosecution. ATF was attentive and diligent in these efforts. There was no unnecessary delay attributable to ATF.

The ATF report was received by the U.S. Attorney's office in January, 1987. The diversion of the Assistant U.S. Attorney who regularly handled ATF cases to a high priority terrorist trial and manpower problems in the U.S. Attorney's office did cause some delay in seeking indictments. Some of this delay could have been avoided if this matter had been given higher priority. Thus, this delay was, in part, "unnecessary." It was not, however, unjustified. Busy prosecutors must establish priorities. As described earlier with regard to defendants' Due Process claim, it is usually appropriate for courts to defer to the good faith operation of those priorities. This case is not an exception.

With regard to the final factor, the court has considered two forms of possible prejudice to the defendants. One form relates to possible prejudice to defendants' right to a fair trial. As discussed previously the evidence does not indicate that the passage

---

**5.** In the circumstances of this case, it is the statute of limitations which is "the primary guarantee against bringing of overly stale criminal charges." *Marion,* 404 U.S. at 322, 92 S.Ct. at 464, *quoting United States v. Ewell,* 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). There is no statute of limitations defense asserted here.

of time has rendered any potentially helpful witness unavailable for trial. The passage of time may, of course, impair memories or otherwise generally affect the presentation of a defendant's case. However, a general assertion that memories have dimmed with the passage of time does not establish substantial prejudice. *Marler*, 756 F.2d at 214. Indeed, as the Supreme Court has recognized, the possible prejudice inherent in any delay may weaken the Government's case, rather than the defendant's case. *Marion*, 404 U.S. at 322, 92 S.Ct. at 464. There have been no showing of specific or special prejudice to any defendant's ability to obtain a fair trial as a result of preindictment delay. Thus, in this case, the possible prejudice to the right to a fair trial is not a meaningful factor for Rule 48 consideration.

The defendants contend that the fact that the federal indictment was not returned before they had served their state sentences resulted in prejudice to them "from the loss of the possibility of receiving a sentence at least partially concurrent with the one [being served.]" *Cabral*, 475 F.2d at 719, *quoting Smith v. Hooey*, 393 U.S. 374, 378, 89 S.Ct. 575, 577, 21 L.Ed.2d 607 (1969). It is uncertain, however, whether any successful federal prosecution could have been completed before defendants were released by the state even if this case had been indicted shortly after it was referred by ATF to the U.S. Attorney's Office. It is also speculative whether a partially concurrent sentence would have been imposed. In any event, any concurrent portion of a federal sentence would have been small if the defendants are subject to receiving a minimum mandatory fifteen year sentence if convicted in this case. Thus, while defendants may have suffered some sentencing prejudice because this case was not indicted earlier, this prejudice is slight.

It is clear, however that the prejudice caused by a denial of a speedy trial is not confined to possible impairment of the accused's right to a fair trial. *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *Judge*, 425 F.Supp. at 504–5. As the First Circuit said in *Marler*, "the

*MacDonald* Court emphasized that the speedy trial guarantee is designed primarily to prevent the deleterious personal effects that prolonged, unresolved public accusation may cause." 756 F.2d at 213, n. 4. In this case there have not been long, unresolved public charges. The state charges were resolved promptly in November, 1986.

■ Nor, with the exception of Thomas Hughes, have the defendants shown any personal prejudice resulting from the federal indictment beyond the harm inherent in being charged with a federal crime. Thomas Hughes has established that the passage of time before his federal indictment entailed a change in his personal circumstances which causes the pending indictment to have a special effect on him. Hughes got married prior to his indictment. He and his wife have recently had a baby. This is a form of prejudice which can be considered in deciding whether to dismiss under Rule 48. *Judge*, 425 F.Supp. at 505. When considered together with the possible sentencing prejudice to Hughes, however, these factors do not persuade the court that dismissal of the case against Thomas Hughes would be appropriate if Rule 48 were applicable.

### C. *Other Constitutional Claims*
#### 1. *Vindictive Prosecution*

■ Defendants suggest that this case should be dismissed because it constitutes a vindictive prosecution, thus violating their constitutional right to Due Process. "Vindictive prosecution occurs when the actions of the judge or prosecutor somehow punish a defendant for exercising constitutional or statutory rights during the prosecution." *Bassford*, 812 F.2d at 20. *See also Blackledge v. Perry*, 417 U.S. 21, 27–28, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974). The concept of vindictive prosecution by two separate sovereigns requires a finding that one sovereign was merely a tool of the other. *Bassford*, 812 F.2d at 20–21. As discussed in detail earlier, this essential element has not been established in this case.

■ Similarly, to succeed on their vindictive prosecution claim in this case the

defendants must show that this federal prosecution is improperly motivated by a desire to punish the defendants for the exercise of their constitutional or federal statutory rights. *Id.* Defendants, however, have failed to make this showing as well.

Therefore, the vindictive prosecution claim is without merit.

### 2. *Remaining Constitutional Claims*

Thomas Hughes contends that subjecting him to a minimum mandatory fifteen years sentence in this case would violate the constitutional prohibitions against cruel and unusual punishment, *ex post facto* laws, and bills of attainder. These claims, however, are not ripe for resolution.

■ The portion of 18 U.S.C.App. II § 1202(a) which provides for a fifteen year minimum mandatory sentence in certain circumstances is a sentencing enhancement provision; it does not create an additional element of the substantive offense of being a felon in possession of a firearm. *United States v. Hawkins,* 811 F.2d 210, 220 (3d Cir.) *cert. denied,* — U.S. —, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987); *United States v. Gregg,* 803 F.2d 568 (10th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1379, 94 L.Ed.2d 693 (1987); *United States v. West,* 826 F.2d 909 (9th Cir.1987); *United States v. Rush,* 840 F.2d 574 (8th Cir.1988); *But see United States v. Davis,* 801 F.2d 754, 755 (5th Cir.1986); *United States v. Brewer,* 841 F.2d 667 (6th Cir.1988). Thus, issues relating to the constitutionality of this provision as applied to Hughes will not arise unless he is convicted on Count Two of the indictment. If and when that occurs, the remaining constitutional claims will be decided.

## IV. CONCLUSION

For the foregoing reasons, the motions to dismiss of Joseph T. Bouthot, Thomas F. Hughes, Kevin J. Brown, and Roger G. Carr, Jr. are hereby DENIED.