**UNITED STATES of America,**
**Appellant,**

v.

**Joseph T. BOUTHOT, et al.,**
**Defendants, Appellees.**

**No. 88–1710.**

United States Court of Appeals,
First Circuit.

Heard Jan. 11, 1989.

Decided June 21, 1989.

Paul V. Kelly, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for U.S.

Robert L. Sheketoff and Jeffrey Smith, by Appointment of the Court, with whom Norman S. Zalkind, and Zalkind, Sheketoff, Homan, Rodriguez & Lunt, Boston, Mass., were on joint brief, for defendants, appellees.

Before CAMPBELL, Chief Judge ALDRICH and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

The government appeals from two pretrial suppression orders in this criminal case. One order prohibited the government from using the defendants' state court guilty pleas for impeachment purposes in federal court. The other order excluded certain identification evidence. We begin by describing the factual findings upon which the district court based its rulings. *See United States v. Bouthot,* 685 F.Supp. 286, 288–92 (D.Mass.1988).[1]

On September 4, 1986, the Holden, Massachusetts home of Kenneth Holtgren was burglarized. The burglars, who fled in a van, stole guns and jewelry worth more than $100. The van was apprehended by the police shortly thereafter. Its five occupants—Joseph Bouthot, Thomas Hughes, George Hughes, Kevin Brown, and Roger Carr—were arrested. They were charged with the following violations of Massachusetts law in connection with this incident: breaking and entering in the daytime with the intent to commit a felony; larceny of property worth over $100; receipt of stolen property worth over $100; and carrying a firearm without a license.

Immediately after the arrests, Holden Detective Albert Bourget, who was in charge of the case, called Agent Douglas Wenner of the United States Bureau of Alcohol, Tobacco, and Firearms (the ATF) because he thought the federal government might be interested in prosecuting the defendants under the new federal Armed Career Criminal statute, which imposes a mandatory fifteen year minimum sentence on persons convicted of receiving or possessing a firearm after having been previously convicted three times of robbery or burglary. *See* 18 U.S.C. § 924(e). Wenner felt the case could be prosecuted under the federal Armed Career Criminal Act. He opened a federal investigation of the defen-

dants. Although Bourget cooperated with Wenner by providing him information and documents, the federal investigation was distinct from the state investigation.

To avoid the complications arising from state and federal prosecutions of gun charges based on the same incident, Wenner and Bourget agreed that the state firearms charges should be dropped in favor of federal firearms charges. They both realized that the final decision with respect to this issue would have to be made by state and federal prosecutors. Bourget recommended to Neil Snyder, the Assistant District Attorney then in charge of the state case, that the state firearms charges be dropped in light of the possible federal firearms prosecution. Snyder said that he would drop the firearms charges prior to trial. The case was subsequently transferred to another Assistant District Attorney, Thomas Landry. Snyder left a note for Landry stating that "the cases on carrying guns to be charged in [federal court]. Holden [Police Department] will speak to you about this." 685 F.Supp. at 289.

On October 16, 1986, the day the defendants were scheduled for trial, Wenner went with Bourget to the Worcester Superior Court. Wenner spoke briefly with Landry, explaining that he was conducting a federal investigation concerning the firearms which he hoped would lead to a federal Armed Career Criminal prosecution. After the discussion, Wenner expected that Landry would dismiss the state firearms charges. The main reason for Wenner's visit, however, was to talk with Roger Carr, one of the defendants in the case. Because it appeared that Carr's record might not qualify him for Armed Career Criminal treatment, Wenner wanted Carr to testify against his codefendants in the federal prosecution that Wenner hoped would ensue in exchange for a more lenient sentencing recommendation. Landry said he had no objection to Wenner making such a proposal, and in fact introduced Wenner to Carr's attorney, William Meehan. Sub-

---

**1.** The government accepts these findings except in one respect, which we discuss later. *See*   *infra* note 8.

sequently, Wenner spoke to Meehan and explained his interest in speaking with Carr. Meehan said that he would prefer that Wenner wait until the end of the state prosecution, at which point Meehan's responsibilities would be over, and Wenner could approach Carr directly. Wenner agreed to do so. Wenner never asked either Landry or Meehan not to reveal the substance of their conversations to the other defendants, although he hoped that they would not do so, believing that such disclosure would make it more difficult to obtain Carr's cooperation.

As it turned out, neither Landry nor Meehan did disclose the pending federal prosecution to Carr, his codefendants, or their attorneys. The district court found that Meehan never told Carr about his conversation with Wenner. Landry, hoping to use the dismissal of the firearms charges as a bargaining chip to obtain a plea agreement, also did not disclose the possibility of a federal prosecution. When his attempts to negotiate a plea agreement failed, Landry simply informed the judge (before the jury was empaneled) that he was dropping the firearms charges.

The trial was continued until November 12, 1986. Plea negotiations resumed on November 13, 1986, the day after the jury was empaneled. An agreement was finally reached which provided that the state would recommend sentences under which the defendants would serve less than one year. Once again, Landry did not disclose the possibility of federal firearms indictments because he was afraid that such disclosure would prevent him from obtaining guilty pleas on the state charges. He was also uncertain whether the federal prosecution would actually take place.

After the guilty pleas were negotiated, the judge entered into a colloquy with each of the defendants. After satisfying himself that the pleas were made voluntarily and knowingly, the judge directed the clerk to enter findings of guilty on the breaking and entering and larceny counts. The judge dismissed the receiving count. On the firearms count, the judge declared each defendant "not guilty, discharged." The judge then sentenced each defendant to the term of incarceration recommended by Landry.

Landry felt the court erred in declaring the defendants not guilty on the firearms charges because those charges had actually been dismissed prior to trial. He did not bring the matter to the judge's attention, however, because he believed the judge's action was the functional equivalent of a dismissal.

The scene then shifts to the federal prosecution. On August 31, 1987, a federal grand jury returned a two count indictment charging the five state court defendants, including Bouthot and Hughes, with being felons in receipt of firearms (in violation of 18 U.S.C. § 922(h)(1)) and felons in possession of firearms (in violation of a provision now codified at 18 U.S.C. § 922(g)(1)). The indictment expressly charged all of the defendants except Carr with having three prior convictions for robbery or burglary within the meaning of the Armed Career Criminal Act. Following the issuance of the indictment, numerous pretrial motions were filed by the defendants, including claims based on the Double Jeopardy Clause and a claim to exclude, under Rule 403, evidence of defendant's state court guilty pleas as part of the government's direct case. The district court held pretrial hearings on these motions in December 1987 and January 1988. On the latter motion, the court ruled in favor of the defendants on January 5, 1988. The government did not appeal that order.

Later, on April 8, 1988, the district court issued rulings adverse to the defendants on most of the other pretrial motions. *See* 685 F.Supp. 286 (D.Mass.1988). After these rulings, on May 25, 1988, the other three defendants decided to plead guilty and were sentenced. The district judge then considered the two remaining pretrial motions filed by Bouthot and Thomas Hughes. On June 8, 1988, he allowed their motion to suppress the state guilty pleas for all purposes, including cross-examination and impeachment (the June 8 order). On June 13, 1988, he allowed a motion by Bouthot to prohibit an in-court identifica-

tion of Bouthot by Paul Northway because the identification was tainted by an out-of-court identification procedure (the June 13 order).

The government appeals the latter two rulings.

■ *First.* The defendants raise a threshold jurisdictional issue: whether the government has the right to appeal the June 8 order. They point out that the government cannot appeal in a criminal case except as authorized by statute. *See United States v. Kane,* 646 F.2d 4, 5 (1st Cir.1981). 18 U.S.C. § 3731 authorizes appeals from orders suppressing evidence, but only if the U.S. Attorney certifies to the court that the "evidence is a substantial proof of a fact material in the proceeding." Although such a certification has been made, the defendants challenge its veracity. They interpret the phrase "material" as referring to an element of the offense, and argue that impeachment evidence cannot be substantial proof of a material fact, relying on *United States v. Loud Hawk,* 628 F.2d 1139, 1150 (9th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980). To allow interlocutory appeals on such collateral matters, they argue, defeats the accused's interests in swiftly proceeding to trial on the indictment.

The government responds that the statute should be interpreted broadly to allow appeals whenever a United States Attorney makes the certification required by the statute. There should be no independent assessment of the certification. Two Circuits have interpreted the statute in the manner suggested by the government. *See In Re Grand Jury Investigation,* 599 F.2d 1224, 1226 (3d Cir.1979); *United States v. Comiskey,* 460 F.2d 1293, 1297–99 (7th Cir.1972). Without directly addressing this issue, the Ninth Circuit has, on at least one occasion, independently evaluated the certification, found it unsupported, and decided that the government appeal was improper. *See United States v. Loud Hawk,* 628 F.2d 1139, 1150 (9th Cir.1979).

We do not need to decide this issue here because we find the government is entitled to appeal under either interpretation of the statute. The entitlement is undisputed under the first interpretation, because the defendants do not argue that the certification was improper. As regards the second interpretation, we find that the evidence in question is a "substantial proof of a fact material in the proceeding." The state guilty pleas are offered to prove that the defendants stole firearms, which is a material fact relevant to the federal prosecution for possession of firearms, even under the defendant's interpretation of the phrase. It is true that the government seeks to use the evidence for rebuttal purposes, but that is only because the district court has ruled that the government may not use that evidence in its direct case. *Loud Hawk* does not stand for the proposition that the government may never appeal an order suppressing impeachment evidence. As regards the defendants' policy argument, we agree with the government that the infringement of defendants' speedy trial rights caused by this appeal is outweighed by the reliability of this evidence, which consists of an admission by the defendants.

Having decided the jurisdictional issue, we turn to the merits. The district court's June 8th order suppressing for all purposes the statements made in the plea colloquy on the state charges was based on both the Self–Incrimination Clause and the Due Process Clause of the Fifth Amendment. Assistant District Attorney Landry's failure to disclose the pending federal investigation to the defendants and their attorneys was the "functional equivalent" of a misrepresentation, Appendix at 652 (hereinafter App.), and undermined the knowing, intelligent, and voluntary character of the defendants' guilty pleas. Furthermore, given the duty of good faith imposed by the Due Process Clause upon the prosecutor during plea bargaining, it would not be "appropriate and fair" in the circumstances of this case to allow the admission of evidence concerning the state pleas for any purpose in the federal case. *Id.* at 659.

■ Notwithstanding the packaging of this issue, the defendants are essentially collaterally attacking their state court

guilty pleas. *See United States v. Long*, 852 F.2d 975, 979–80 (7th Cir.1988). Ordinarily, it is inappropriate for a federal court to review such a claim without allowing the state courts a prior opportunity to do so. *See generally* C. Wright & A. Miller, 17A *Federal Practice & Procedure* § 4264. Nevertheless, the Seventh Circuit has reviewed such a challenge, even when raised for the first time in a non-habeas collateral proceeding, when the challenge was premised on a constitutional issue. *See id.; United States v. Howze*, 668 F.2d 322, 323 (7th Cir.1982). Similarly, we entertain this non-habeas collateral challenge because the interests of comity and federalism that underlie the exhaustion doctrine will be better served if we address the merits forthwith. *See Granberry v. Greer*, 481 U.S. 129, 134–35, 107 S.Ct. 1671, 1675–76, 95 L.Ed.2d 119 (1987).

■ A guilty plea waives the defendant's right against compelled self-incrimination and his right to a trial by jury. *See Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970). "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* (footnote omitted). The application of this principle to guilty pleas has produced the following rule:

> "[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)." *Shelton v. United States*, 242 F.2d 101, 115 (9th Cir.) (Tuttle, J., dissenting), *set aside*, 246 F.2d 571, 572 n. 2 (9th Cir.1957) (en

banc), *rev'd on other grounds*, 356 U.S. 26 [78 S.Ct. 563, 2 L.Ed.2d 579] (1958) [quoted with approval in *Brady*, 397 U.S. at 755, 90 S.Ct. at 1472].

Under this rule, the defendants in this case can attack their pleas on two grounds. First, they were unaware of the direct consequences of their pleas because they were not warned about the imminent federal prosecution. Second, their guilty pleas were induced by a material omission tantamount to a misrepresentation: the state prosecutor's failure to mention the ongoing federal investigation.

■ Even though Rule 11 of the Federal Rules of Criminal Procedure no longer requires such a distinction,[2] a number of courts continue to distinguish between direct and collateral consequences of a guilty plea. *See* C. Wright & A. Miller, 1 *Federal Practice & Procedure* § 173, at 605–06. It is well settled that the defendant must be advised of the former, but that he need not be advised of the latter. *Id.* at 606; *see Núñez Cordero v. United States*, 533 F.2d 723, 726 (1st Cir.1976). The distinction turns on whether the consequence represents "a definite, immediate, and largely automatic effect on the range of a defendant's punishment." *Cuthrell v. Director, Patuxent Institution*, 475 F.2d 1364, 1366 (4th Cir.), *cert. denied*, 414 U.S. 1005, 94 S.Ct. 362, 38 L.Ed.2d 241 (1973). Even under the circumstances of this case, there can be no doubt that a federal firearms prosecution was not a largely automatic, definite, or immediate consequence of the state guilty pleas. "The state and federal systems are separate and distinct, and the defendant need only be informed of the direct consequences he may face within the particular system." *United States v. Long*, 852 F.2d 975, 979 (7th Cir.1988). A state judge, even if she is aware of the federal implications of a state conviction, is not constitutionally required to warn a defendant about his federal exposure before accepting his guilty plea. *See id.*[3] It is

---

**2.** We note that the defendants have not alleged any violation of the Massachusetts Rules of Criminal Procedure with respect to their state court guilty pleas.

**3.** We respectfully disagree with *United States v. Edwards*, 669 F.Supp. 168, 171 (S.D.Ohio 1987), which reaches a contrary conclusion.

true that the state prosecutor in this case, unlike his counterpart in *Long*, was aware of the existence of an ongoing federal investigation and the possibility of a future federal prosecution. Nevertheless, it was far from clear that a federal prosecution was definitely going to take place. In fact, there was no evidence that the U.S. Attorney's office had even reviewed Agent Wenner's recommendations at the time the defendants entered their guilty pleas. Consequently, we hold that the state court guilty pleas cannot be attacked on the grounds that the defendants were not informed of the consequences of those pleas.[4] The Seventh Circuit has reached a similar conclusion in a recent case featuring an analogous claim. *See United States v. Jordan,* 870 F.2d 1310, 1317 (7th Cir.1989) ("[F]ederal prosecution was only a possibility over which the State Attorney had no control....").

■ Nor do we regard the prosecutor's failure to disclose the existence of an ongoing federal investigation as equivalent to a misrepresentation. The state prosecutor's silence did not affect the defendants' understanding of the direct consequences of their guilty pleas. *Cf. Jordan,* 870 F.2d at 1318 ("The issue was not misrepresented because it was not represented at all."). If the state prosecutor had been asked whether the incident had been referred to federal agents, or whether the plea agreement precluded federal charges, and had responded untruthfully to either question, we would have little hesitation in characterizing the pleas as wrongfully induced by active misstatements. *See Correale v. United States,* 479 F.2d 944, 947 (1st Cir.1973) (stating that "the most meticulous standards of both promise and performance must be met by prosecutors in plea bargaining"). This case, however, involves an omission rather than an act. *Cf. Colorado v. Spring,* 479 U.S. 564, 576, 107 S.Ct. 851,

858, 93 L.Ed.2d 954 (1987) (drawing similar distinction in *Miranda* context); *Cepulonis v. Ponte,* 699 F.2d 573, 577 (1st Cir.1983) (stating that misinformation may be more vulnerable to constitutional challenge than mere lack of information). We do not question the district court's finding that the undisclosed information was material and would in fact have led the defendants to alter their decision to plead guilty. *See* App. at 650. Even so, there is no doubt that the Constitution does not require a state to provide a defendant with every piece of information that would affect his decision to plead guilty. *Cf. Moran v. Burbine,* 475 U.S. 412, 422–23, 106 S.Ct. 1135, 1141–42, 89 L.Ed.2d 410 (1986) (reaching similar conclusion in the *Miranda* context). We refuse to rule that a plea-bargaining defendant has a constitutional right to information possessed by the prosecutor regarding an ongoing or potential prosecution by another sovereign.[5] The Supreme Court's precedents "do not place an affirmative duty on the prosecution to discuss all possible ramifications of a defendant's guilty plea. Rather, they prohibit false representations and mandate compliance with promises made." *Jordan,* 870 F.2d at 1316; *see United States v. Persico,* 774 F.2d 30, 33 (2d Cir.1985) (deciding that defendants pleading guilty to bribery and conspiracy charges in the Eastern District of New York were not entitled to be told that a grand jury in that District was simultaneously investigating possible RICO violations committed by them). We hold that the state guilty pleas were not induced by a misrepresentation.

■ The district court found that the circumstances of this case were "different" than when a defendant seeks to withdraw a guilty plea. App. at 656. He conceded that in the latter situation legitimate considerations require that the government must only reveal direct consequences in

---

4. A different question would be presented if the state and federal prosecutors had acted in concert, but that issue is not before us today.

5. A closer case would be presented if both prosecutions were instituted by the same sovereign. *See United States v. Krasn,* 614 F.2d 1229, 1234 (9th Cir.1980); *United States v. Quigley,* 631 F.2d

415, 416–17 (5th Cir.1980). *But cf. United States v. Persico,* 774 F.2d 30, 33 (2d Cir.1985) (stating that plea agreements entered into by one U.S. Attorney do not ordinarily bind any other U.S. Attorney). We do not express any opinion on the resolution of that issue.

order to protect a plea. Those legitimate considerations, he reasoned, do not apply in the context of the admissibility of evidence. Consequently, he appears to have concluded that the Self–Incrimination Clause prevents the federal prosecutor from admitting the state convictions into evidence at the federal trial because the state prosecutors had not disclosed to the defendants the collateral consequences of pleading guilty. We cannot accept this logic. We refuse to graft a "second generation" test on the validity of a guilty plea. If collateral review establishes that a plea was validly entered, nothing in the Self–Incrimination Clause prevents proof of the resulting conviction from being admitted into evidence at a subsequent trial that is a collateral consequence of the guilty plea.[6] *See Jordan*, 870 F.2d at 1315–19; *Long*, 852 F.2d at 980; *United States v. Howze*, 668 F.2d 322, 324 (7th Cir.1982).

■ The district court's order was also based on the belief that the state prosecutor's conduct was so offensive that it deprived the defendants of the fundamental fairness guaranteed by the Due Process Clause. We do not condone the behavior of the state prosecutor in this case, but at the same time we do not feel that his conduct amounts to the "kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Moran*, 475 U.S. at 433–34, 106 S.Ct. at 1147–48 (holding that police conduct which involved deceiving an attorney about when her client would be questioned and failing to inform a suspect of his attorney's efforts to represent him and communicate with him did not deprive suspect of fundamental fairness). The state prosecutor's behavior

may have been unethical, but "[t]he Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty." *Mabry v. Johnson*, 467 U.S. 504, 511, 104 S.Ct. 2543, 2548, 81 L.Ed.2d 437 (1984). The defendants in this case were not deprived of their liberty in any fundamentally unfair manner in the state court proceedings.

The June 8 order is *vacated.*[7]

*Second.* The factual background for the June 13 order is as follows. Paul Northway is the Chief of Parks for the town of Holden. On September 4, 1986, at approximately 2:00 p.m., Northway was the passenger in a truck that passed directly in front of the Hultgreen residence. On that afternoon, he observed two white males putting a pink blanket with what appeared to be pipes sticking out of it into the back of a truck. He had approximately thirty seconds to observe what was going on; at the closest point, he was no more than ten feet from the person holding the bundle.

When Northway heard that the Hultgreen residence had been burglarized, he immediately contacted the police, but did not provide any specific details—age, height, weight—identifying the two persons that he had seen. Later, but before Northway's first appearance in court, Detective Bourget showed Northway ten photographs, including one of Bouthot, to see if Northway could identify any one of those men as being a participant in the robbery. Bourget did not keep records of this session and no longer remembers it, but Northway is certain that he was shown photographs and that he did not identify Bouthot from among them.

---

6. A defendant who pleads guilty waives, among other things, his right to confront witnesses with respect to the crime with which he is charged. The Seventh Circuit has pointed out that the use of that guilty plea to prove an element of a crime charged at a subsequent trial may jeopardize the defendant's confrontation rights with respect to the second crime with which he is charged. *See United States v. Howze*, 668 F.2d 322, 324 n. 3 (7th Cir.1982); *see also United States v. Edwards*, 669 F.Supp. 168, 170–71 (S.D. Ohio 1987). Because the guilty pleas here cannot be used in the government's

direct case, the problem identified by the Seventh Circuit is not presented.

7. Because our decision addresses only the constitutional issues, we express no opinion on whether the trial court may exclude the guilty pleas, even as impeachment evidence, under Fed.R.Evid. 403. *See* Transcript of Motion Hearing held on January 5, 1988, at 22–23 (*reproduced in* Brief for the United States, Addendum A).

Northway was subpoenaed to appear as a witness in the state trial. When present on these occasions, he spoke with other witnesses, including members of the Hultgren family. He saw all five defendants being brought into court, and observed the proceedings that followed.

Twenty months later, in June 1988, federal officers preparing for trial in this case conferred with Northway. He was shown fourteen photographs and immediately identified the five photographs that portrayed the defendants in this case. He also identified Bouthot as the man who was carrying the bundle wrapped in a pink blanket. He bases the identification in part on the fact that Bouthot and he look alike. The district court conceded the strong resemblance between the two men, but found that Northway did not recognize this resemblance on September 4, 1986. "Mr. Northway was unable to identify Joseph Bouthot or anyone else prior to the time he went to Worcester District Court in connection with this case."[8] App. at 816.

In his June 13 ruling on the identification evidence, the district court relied on the two-part test that is followed in this Circuit. *See Judd v. Vose*, 813 F.2d 494, 498 (1st Cir.1987); *Perron v. Perrin*, 742 F.2d 669, 675 (1st Cir.1984). An in-court eyewitness identification following a pretrial identification must be set aside if the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The first part of the test determines whether the identification procedure was impermissibly suggestive. If this prong is satisfied, the court must address the second prong of the test.

That prong inquires whether, under the totality of the circumstances, the suggestiveness is such that there is a very substantial likelihood of irreparable misidentification. This determination is based on the factors described in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972)—the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

Applying this framework to the facts of this case, the district court found that the Worcester County Court events were "very suggestive." App. at 818. "It is hard to imagine anything that could more vividly impress the witness' mind in the identity of Joseph Bouthot." *Id.* He then turned to the second part of the test, reviewing the *Biggers* factors. He found that Northway had 30 seconds to observe Bouthot, and that Northway was not paying special attention to Bouthot during that brief time. *Id.* at 818–19. Northway's initial description of Bouthot was "extremely vague." *Id.* at 819. Northway was not "very certain" that Bouthot was the person he saw on September 4. *Id.* at 820. Finally, over twenty months elapsed between the crime and the identification. The district court concluded that the second part of the test was satisfied, and that it would therefore violate due process to allow Northway to make an in-court identification of Bouthot.

The problem with the district court's analysis, the government argues, is that there was no impermissibly suggestive identification procedure conducted by the government.[9] To establish a due process

**8.** The government challenges this finding, arguing that it is clearly erroneous. It claims that the record contains unrebutted evidence to prove that Northway had noticed the resemblance between Bouthot and him *before* September 4, 1986. Northway recognized Bouthot's photograph in the array first shown to him by Detective Bourget, but did not communicate that fact to Bourget because he found it "embarrassing" that he looked so much like the defendant. App. at 721. The district court concluded that Northway's testimony on this issue was not credible. *See* App. at 818. Credibility determinations by the trier of fact are accorded special deference. *See Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Upon reviewing the record, we find that there is no justification for overturning the district court's factual findings.

**9.** The government also suggests that the Worcester County courthouse confrontations did not amount to a "procedure," *see* Reply Brief for the United States at 9, presumably

violation, the defendant must demonstrate that there was some improper governmental action. The only governmental action with respect to the state court events was that Northway had been summoned as a witness by an Assistant District Attorney. There is no allegation, let alone any evidence, that the courtroom confrontation was orchestrated in order to obtain an identification. Consequently, the government submits, the first part of the test is not satisfied, and the district court's order must be reversed.

The government's challenge is predicated on *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).[10] The defendant in that case, after receiving appropriate *Miranda* warnings, had made an incriminating confession to police officers because he felt compelled to do so by the "voice of God." A psychiatrist testified that Connelly was experiencing "command hallucinations." *Id.* 479 U.S. at 161, 107 S.Ct. at 519. This condition interfered with Connelly's volitional abilities, but did not significantly impair his cognitive abilities. *See id.* at 160–62, 107 S.Ct. at 518–19. Connelly argued that his confession should be excluded because it was involuntary. The Supreme Court rejected his claim, ar-

guing that there was no basis for concluding that any state actor had denied Connelly the due process of law. "The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause.... The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution." *Id.* at 167, 107 S.Ct. at 522. Because the police were not responsible for Connelly's statements, excluding those statements would not serve as a deterrent.

■ The *Connelly* logic does not apply to this case. Whereas coerced confessions may violate an independent constitutionally protected interest, the suggestive identification of a suspect *per se* does not violate any constitutionally protected interest. In the latter scenario, a constitutional violation, if any, occurs only when testimony regarding the suggestive pretrial identification (or an in-court identification based upon it) is introduced at trial. *See United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 406 (7th Cir.) (Stevens, J.), *cert. denied*, 421 U.S. 1016, 95 S.Ct. 2424, 44 L.Ed. 2d 685 (1975). Whereas a coerced confession is suppressed primarily to deter future

because they were not planned or routine occurrences. We have never adopted such a crabbed interpretation of that phrase. On two previous occasions when we were presented with due process challenges based on accidental confrontations, we rejected those challenges on the merits, and did not dismiss them summarily because they were unplanned happenstances. *See United States v. Massaro*, 544 F.2d 547, 550 (1st Cir.1976) (Justice Clark, sitting by designation), *cert. denied*, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977); *Allen v. Moore*, 453 F.2d 970, 974 (1st Cir.) (Aldrich, C.J.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2422, 32 L.Ed.2d 668 (1972). Other Circuits have tackled accidental confrontations in a similar manner. *See United States v. Domina*, 784 F.2d 1361, 1369–70 (9th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987); *Albert v. Montgomery*, 732 F.2d 865, 871–72 (11th Cir.1984); *United States v. Thevis*, 665 F.2d 616, 643 (5th Cir.), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed. 2d 61 (1982).

**10.** The government also cites *Gullick v. Perrin*, 669 F.2d 1, 3 (1st Cir.1981), for the proposition that it is unnecessary to consider the reliability of identification testimony in the absence of evidence that "suggestive procedures were em-

ployed by the police." The quoted passage summarizes the findings of the New Hampshire trial court in that case. Even to the extent the panel later adopted the same reasoning, *see id.* at 5, we are certain that it was not attempting to decide the question presented by this appeal— whether identification testimony based on an impermissibly suggestive procedure may be excluded under the Due Process Clause even if the procedure was not orchestrated by the police.

Although not cited by the government, there are state cases that do support its argument. *See Kimble v. State*, 539 P.2d 73, 77 (Alaska 1975) (holding that there is no due process violation when an accidental pretrial confrontation is not prearranged by the state); *Hill v. United States*, 367 A.2d 110, 115 (D.C.1976) (holding that suppression of identification testimony on grounds of suggestiveness is proper only as a tool to curtail improper police procedure); *State v. Greathouse*, 694 S.W.2d 903, 907 (Mo.Ct. App.1985) (stating that no due process issue was raised by accidental confrontation because it was not compelled by the police); *People v. Graham*, 67 A.D.2d 172, 415 N.Y.S.2d 714, 717 (App.Div.1979) (same).

violations of the Constitution, overly suggestive identifications are suppressed primarily to avoid an unfair trial. *See id.* at 408. In the latter scenario, the Due Process Clause protects an evidentiary interest: reliability. *See Manson v. Brathwaite,* 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–53, 53 L.Ed.2d 140 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony...."); *Clemons v. United States,* 408 F.2d 1230, 1251 (D.C.Cir.1968) (Leventhal, J., concurring), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). There is no *per se* rule excluding identifications tainted by impermissibly suggestive procedures; such identifications will be admitted at trial if the totality of the circumstances indicates that they are reliable. *See Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253. Because the due process focus in the identification context is on the fairness of the trial and not exclusively on police deterrence, it follows that federal courts should scrutinize all suggestive identification procedures, not just those orchestrated by the police, to determine if they would sufficiently taint the trial so as to deprive the defendant of due process. *See Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986) ("[O]nly the effects of, rather than the causes for, preidentification encounters should be determinative of whether the confrontations were unduly suggestive."), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987); *Green v. Loggins,* 614 F.2d 219, 222 (9th Cir.1980); *United States v. Ballard,* 534 F.Supp. 749, 751 (M.D.Ala.1982); *State v. Fullwood,* 476 A.2d 550, 558 n. 9 (Conn.1984); *People v. Reynolds,* 116 Ill.App.3d 328, 71 Ill.Dec. 849, 856, 451 N.E.2d 1003, 1010 (Ill.App. 1983); *People v. Moore,* 96 A.D.2d 1044, 466 N.Y.S.2d 456, 457 (App.Div.1983); W. LaFave & J. Israel, 1 *Criminal Procedure* § 7.4, at 583 (1984).

■ Having resolved the doctrinal issue, we now turn to the actual facts of this case. The government, in its brief and during oral argument, has never challenged the district court's conclusions that the Worcester courthouse confrontations were (a) impermissibly suggestive and (b) created a "substantial likelihood of irreparable misidentification." We have reviewed the record, and agree with the district court that "it is the corrupting effect of the exposure which Mr. Northway had with Mr. Bouthot ... [in] the Worcester County District Court which has created a present certainty that Mr. Bouthot is the one he saw in the back of the car carrying the blanket.... [A]ny in[-]court identification would be based on exposure at the Worcester County Court rather than Mr. Northway's independent memory of what happened or what he saw happen[ ] on September 4, 1986." App. at 820. Consequently, we *affirm* the district court's June 13 order granting Bouthot's Motion to Suppress the Northway identification.[11]

*The case is remanded to the district court for trial.*

---

**11.** Our decision should not be misinterpreted to narrow the jury's province. In most cases, the jury is capable of assessing the appropriate weight to be given to identification evidence. *See Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2254. It is only in rare circumstances, such as those presented in this case, when identification testimony creates a "very substantial likelihood of irreparable misidentification," that identification evidence will be withheld from the jury.