April 7, 1993

United States Court of Appeals
For the First Circuit

No. 91-1860

UNITED STATES,
Appellee,

v.

JOSE DE JESUS-RIOS, a/k/a PAPO RIOS,
Defendant, Appellant.

No. 91-1933

UNITED STATES,
Appellee,

v.

EVA RIOS,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen C. Cerezo, U.S. District Judge]

Before

Stahl, Circuit Judge,

Aldrich and Coffin, Senior Circuit Judges.

Gabriel Hernandez Rivera for appellant Jose De Jesus-Rios and

Juan Acevedo-Cruz with whom Wilma E. Reveron-Collazo was on brief for

appellant Eva Rios.
Jose A. Quiles Espinosa, Senior Litigation Counsel, with whom

Daniel F. Lopez Romo, United State Attorney, and Antonio R. Bazan,

Assistant United States Attorney, were on brief for appellee.

April 7, 1993

STAHL, Circuit Judge. Appellants Jose de Jesus

Rios ("Jose Rios") and his cousin, Eva Maria Rios ("Eva

Rios"), were convicted of aiding and abetting each other in

the importation of approximately 196 kilograms of cocaine

into the customs territory of the United States in violation

of 18 U.S.C. 2 and 21 U.S.C. 952(a). Appellants also

were convicted of aiding and abetting each other in the

possession with intent to distribute cocaine in violation of

18 U.S.C. 2 and 21 U.S.C. 841(a)(1). On appeal, both

maintain that the evidence was insufficient to support their

respective convictions. Eva Rios also argues that the

district court erred in denying her motion to suppress the

pretrial identifications of her by two government witnesses.

After careful consideration of the record, we affirm the

conviction of Jose Rios and vacate that of Eva Rios.

I.

Factual Background

The two principal government witnesses, George

Rivera Antron ("Rivera") and Juan Enrique Mejias Valle

("Mejias"), brothers-in-law who had known each other more

than thirty years, worked together aboard a vessel named the

"Santa Martina." The Santa Martina, which was owned by

Rivera, transported general cargo between the islands of

Puerto Rico and St. Thomas. Rivera made his livelihood as

-2-
2

the captain of the Santa Martina, and Mejias was employed as

his assistant.

On February 7, 1991, at approximately 5:30 p.m.,

while Mejias was working on the Santa Martina, which was

docked at a port in St. Thomas, two women approached him

looking for Rivera. Mejias informed them that Rivera was on

an errand and would probably return around 6:00 p.m. The two

women waited for Rivera for approximately fifteen minutes,

during which time they engaged Mejias in casual conversation.

For reasons unexplained in the record, they departed before

Rivera returned to the boat.

The following morning, at approximately 8:00 a.m.,

one of the two women returned to the boat looking for Rivera.

Mejias, who was preparing the boat for departure, informed

her that Rivera was on an errand and would return shortly. A

few minutes later Rivera returned, and the woman, posing as a

commercial dealer in detergent, asked him to transport ten

boxes of detergent to Fajardo, Puerto Rico. Rivera agreed

and they made the necessary arrangements. When Rivera asked

what name should be entered on the receipt as "sender," the

woman responded "A & A Supplies." When asked what name to

enter as receiver, she responded "Papo Rios." At some point

during their conversation, the woman told Rivera that she

would "send the boxes later." The conversation between

-3-
3

Rivera and the woman, which was witnessed by Mejias, lasted

somewhere between five and fifteen minutes.

Approximately one-half hour after she left, two men

drove up to the dock in a truck with the ten boxes. One of

the men told Rivera that "the lady sent the boxes." About an

hour after the ten boxes were loaded onto the Santa Martina,

Rivera and Mejias departed St. Thomas for Fajardo, Puerto

Rico.

The Santa Martina arrived in Fajardo later that

afternoon. After docking the vessel, Rivera went to customs

to enter all of his cargo. On the way to customs, Rivera was

approached by Jose Rios, who -- as it turned out -- had been

a longtime acquaintance of Rivera's. Rivera knew Jose Rios

as "Papo Rios." Rivera asked Jose Rios to accompany him to

customs to sign for the ten boxes being delivered to him. On

the way to customs, Jose Rios disclaimed ownership of the

boxes, and told Rivera that he did not know why the boxes had

been sent to him. At customs, however, Jose Rios signed the

entry declaration as the "owner" of the ten boxes. Rafael

Figueroa, a United States customs agent who witnessed Jose

Rios sign the declaration, testified that Jose Rios appeared

"nervous" as he answered questions about his ownership of the

ten boxes.

After all of the relevant customs documents were

processed, Rivera, Jose Rios, and United States Customs Agent

-4-
4

Angel Luis Villegas Lopez ("Agent Villegas"), went to the

Santa Martina to unload its cargo. As Jose Rios was carrying

one of the boxes off the boat, Agent Villegas became

suspicious about its weight and decided to inspect it. Agent

Villegas opened one of the boxes and discovered powder that

appeared to be cocaine. Upon hearing that cocaine may have

been discovered, Jose Rios disclaimed ownership of the boxes,

stated that he was "going to look for the owners," and

promptly departed the scene.

Shortly thereafter, Agent Villegas conducted a

field test on the powder in one of the boxes. That test

yielded a positive result for cocaine.1 The government then

seized the Santa Martina, informing Rivera that it would be

held pending the investigation. Several days later, the

government arrested Jose Rios, and began its search for the

as yet unidentified woman who had contracted with Rivera to

ship the ten boxes to Fajardo. The facts leading up to the

identification ofEva Rios asthat person aresummarized below.2

1. A subsequent field test and laboratory analysis of the
powder in the ten boxes confirmed that it was cocaine. A
government witness testified that the cocaine had a "street
value" of as much as 40 million dollars.

2. In reviewing the denial of a motion to suppress, our
review is not limited to the transcript of the suppression
hearing where, as here, the defendant renewed her motion at
trial. See United States v. Thomas, 875 F.2d 559, 562 n.2

(6th Cir.) (holding that appellate review of denial of motion
to suppress may include evidence adduced at trial only in
cases where defendant renews the motion at trial), cert.

denied, 493 U.S. 867 (1989). See also 4 Wayne R. LaFave,

-5-
5

On February 8, 1991, both Rivera and Mejias gave

verbal descriptions of the woman who had contracted with

Rivera to United States Customs Agent Hector Marti Figueroa

("Agent Marti"). According to Agent Marti, both Rivera and

Mejias described the woman as a "Latin female" with "dark

hair" and "white" skin who was "a little chubby" and

approximately five feet, two inches tall.

On February 11, 1991, Rivera was interviewed again

by United States Customs Agent Juan Dania ("Agent Dania"),

and Agent Marti. Relying upon written notes, Agent Dania

testified that Rivera described her as "white" with "shoulder

length [black] hair" and "a full face . . . with fine

features."3 The next day, on February 12, Agents Dania and

Search & Seizure 11.7(c), at 519 (2d ed. 1987) ("If

following [her] conviction the defendant takes an appeal and
claims that [her] motion to suppress was erroneously denied,
. . . the appellate court [must] consider trial evidence

favorable to . . . the defendant . . . where the pretrial
motion is renewed and reconsidered by the trial judge during
the course of trial.") (emphasis in original). Cf. United

States v. Vargas, 633 F.2d 891, 895 n.6 (1st Cir. 1980) ("the

use of trial testimony to undermine the validity of an arrest

or search is apparently discouraged, at least when the motion
to suppress has not been renewed and reconsidered during the
course of the trial") (emphasis in original).

3. At the suppression hearing, Rivera admitted that he
described the suspect to Agent Dania as "white." At trial,
however, Rivera testified that he used the phrase "blanca-
attrigenado," which -- according to the English translations
offered by both the government and defense attorneys -- is
apparently equivalent to describing someone as a "light-
skinned black person." Although a description of Eva Rios's
actual skin color does not appear anywhere in the record, it
is apparent from the government's and defense counsel's
briefs that the phrase "blanca-attrigenado" accurately

-6-
6

Marti also interviewed Mejias. Relying upon his written

notes, Agent Dania testified that Mejias described the woman

as "white."

Although the record is not clear, it appears that

Eva Rios became a suspect based upon independent information

from a confidential informant. Apparently relying upon that

information, Agents Marti and Dania decided to conduct a

show-up identification procedure using Rivera as the

identifying witness and Eva Rios as the potential suspect.

To that end, on February 16, 1991, they arranged with Eva

Rios to meet them in front of the United States Customs

Building in St. Thomas. Immediately after making the

arrangements with Eva Rios, Agent Marti phoned Rivera and

instructed him to be at the United States Customs Building by

11:30 a.m.

Upon Rivera's arrival, Agent Marti informed him

that a suspect, named "Eva Rios," would be meeting the agents

on the steps of the customs building sometime between 11:30

a.m. and 12:00 p.m. Marti also informed Rivera that the

purpose of Eva Rios's visit was to allow him to make an

identification of her. Rivera was instructed to sit in a

parked car across the street from the customs building, and

to signal the agents with a white handkerchief as soon as he

describes her skin color.

-7-
7

could positively identify her as the woman with whom he spoke

on the morning of February 8, 1991.

At some point between 11:30 a.m. and 12:00 p.m.,

Eva Rios arrived at the customs building. Rivera testified

that he saw her as she drove by, as she parked her car, and

again as she walked by his parked car. He did not, however,

give a signal to the officers until she walked up to Agents

Marti and Dania, shook their hands, and sat down next to them

on the stairs of the customs building. Based upon Rivera's

positive identification of Eva Rios, Agents Marti and Dania

arrested her on the spot.

The record reveals that February 16, 1991, was a

Saturday, Eva Rios's car was the only car that drove by the

customs building during the time Rivera was in his parked

car, and, while several women "passed by" the customs

building during that time, only Eva Rios stopped to talk with

the agents. Agents Marti and Dania also testified that they

would not have arrested Eva Rios but for Rivera's positive

identification of her. Subsequently, on or about February

22, 1991, the government returned the Santa Martina to

Rivera.

On February 25, 1991, Rivera and Mejias were

brought to an office in the customs building and shown a

photo-spread of six photographs, one of which was Eva Rios.

Both Rivera and Mejias positively identified Eva Rios from

-8-
8

the photo spread. After Rivera and Mejias made their

respective identifications, Agent Marti, the agent in charge

of the procedure, asked both of them to sign affidavits

attesting to the results. They also included in their

affidavits an additional description of the woman with whom

they spoke on February 8. Rivera described her as "a young

woman . . . with dark hair, light brown complexion, thirty

years old . . . and somewhat fat." Mejias described her as a

lady "with light brown skin, of average height . . . dark

hair and a little fat."

Agent Marti testified that Rivera and Mejias made

their identifications at different times and "never

encountered each other at the office."4 When asked whether

he had had any discussions with Rivera about the incident,

Mejias testified that he ended his employment relationship

with Rivera on February 8, 1991, and had not seen Rivera

between that date and February 25, 1991, the date of the

photo spread identification. During their trial testimony,

Rivera and Mejias also made in-court identifications of Eva

Rios as the woman with whom they spoke on February 8, 1991.

4. Agent Marti's testimony on this question was, however,
contradicted by Mejias, who testified during the suppression
hearing that, on February 25, he and Rivera were at the
office at the same time but went into the office to make
their identifications separately. Mejias testified that,
while he waited in the hall to be called into the office, he
saw Rivera walk into and out of the office.

-9-
9

At trial, both defendants took the stand in their

own defense. Jose Rios testified that he had been asked by

his cousin, Evaristo Rios (Eva Rios's brother), to pick up

the boxes on board the Santa Martina. He denied any

knowledge that the boxes contained cocaine, and claimed not

to have spoken with Eva Rios for seven or eight years. When

asked why he signed the customs document as the "owner" of

the ten boxes, he stated that he did so in order to pick up

the boxes for his cousin.

As well as arguing that she had been misidentified

by Rivera and Mejias, Eva Rios presented an alibi defense.

Essentially, her alibi witnesses testified that she could not

have been on the St. Thomas waterfront at the time in

question. One witness, who worked at the school Eva Rios's

daughter attends, remembered Eva Rios dropping off her

daughter at the school at around 7:30 a.m., on February 8,

1991. An employee at Eva Rios's place of employment

testified that Eva Rios was at work on February 8, 1991, and

usually arrived at work between 8:00-8:10 a.m. A traffic

officer in St. Thomas further testified that, based on the

common traffic conditions in St. Thomas, Eva Rios would not

have been able to travel from her daughter's school to the

waterfront and then to her office between 7:30 a.m. and 8:10

a.m.

-10-
10

On April 30, 1991, the jury found Jose and Eva Rios

guilty on both counts. Jose Rios was sentenced to 210

months, and Eva Rios to 188 months, of imprisonment. These

appeals followed.

II.

Discussion

A. The Admissibility of the Pretrial Identifications of Eva

Rios

Eva Rios's principal contention on appeal is that

Rivera's February 16, 1991, pretrial identification of her

was the result of a highly suggestive, prejudicial, and

unlawful showup procedure, the introduction of which violated

her due process rights. She also argues that Rivera's

February 25, 1991, and his in-court identifications were

tainted by the previous identification, and should,

therefore, also have been kept from the jury.5

We will uphold a district court's denial of a

motion to suppress if any reasonable view of the evidence

supports it. See, e.g., United States v. McLaughlin, 957

F.2d 12, 16 (1st Cir. 1992). Moreover, the findings of the

5. Additionally, Eva Rios argues that the February 25, 1991,
photo spread identification procedure was irregularly
administered and, therefore, rendered Mejias's independent
identification of her inadmissible as well. For the reasons
amply addressed in the district court's opinion, see United

States v. De Jesus Rios, No. 91-0084CCC, slip op. at 4-5

(D.P.R. April 23, 1991), we find this argument meritless, and
see no need to address it further.

-11-
11

district court after a hearing on a pretrial motion to

suppress are binding on appeal unless they are clearly

erroneous. See, e.g., id. at 17.

To determine whether evidence procured as a result

of a pretrial identification procedure should be excluded, a

district court must conduct a two-pronged inquiry. See,

e.g., Allen v. Massachusetts, 926 F.2d 74, 81 (1st Cir.

1991); United States v. Maguire, 918 F.2d 254, 263 (1st Cir.

1990), cert. denied, 111 S. Ct. 2861 (1991); United States v.

Bouthot, 878 F.2d 1506, 1514 (1st Cir. 1989). First, the

court must determine whether the procedure was impermissibly

suggestive. See, e.g., Maguire, 918 F.2d at 263. If the

court finds the procedure impermissibly suggestive, it must

then inquire whether, under the totality of circumstances,

the identification itself was reliable, despite the

suggestive procedure. See, e.g., Allen, 926 F.2d at 81. The

factors to consider under the reliability prong are fivefold:

(1) the opportunity of the witness to
view the criminal at the time of the
crime; (2) the witness' degree of
attention; (3) the accuracy of the
witness' prior description of the
criminal; (4) the level of certainty
demonstrated by the witness at the
confrontation; and (5) the length of time
between the crime and the confrontation.

Id. (quoting United States v. Drougas, 748 F.2d 8, 27 (1st

Cir. 1984)) (citing Neil v. Biggers, 409 U.S. 188, 199-200

-12-
12

(1972)). Before excluding identification evidence,

the court must be persuaded that there was "`a very

substantial likelihood of irreparable misidentification.'"

Bouthot, 878 F.2d at 1514 (quoting Simmons v. United States,

390 U.S. 377, 384 (1968)). A court must also be mindful

that "`it is only in extraordinary cases that identification

evidence should be withheld from the jury.'" Maguire, 918

F.2d at 264 (quoting United States v. Turner, 892 F.2d 11, 14

(1st Cir. 1989)). See also Bouthot, 878 F.2d at 1516 n.11.

In applying the first prong of this test, the

district court concluded that the one person showup

identification procedure was impermissibly suggestive. See

De Jesus Rios, slip op. at 2 ("The agents in this case were .

. . oblivious to the almost uniform criticism of show up in

their use of this unfair and discredited method of

investigation.") (internal quotations and citation omitted)

("`The practice of showing suspects singly to persons for the

purpose of identification[,] and not as part of a [lineup,]

has been widely condemned.'") (quoting Stovall v. Denno, 388

U.S. 293, 302 (1967)). Applying the second prong of the

test, however, the district court concluded -- from the

totality of the circumstances -- that Rivera's identification

was nevertheless reliable. See De Jesus Rios, slip op. at 4

(finding "no significant difference between the descriptions

[Rivera] gave before and after the [showup]"). As a result,

-13-
13

the court denied Eva Rios's motion to suppress that evidence.

See id. at 2-4. After a close review of the record,

we agree with the district court's conclusion that the showup

procedure was impermissibly suggestive but disagree with its

determination that Rivera's identification was otherwise

reliable. While application of the first, second, and fifth

factors enumerated above does not give us pause,6 we are

troubled by application of the third and fourth factors

(i.e., the accuracy of the witness's prior description of the

criminal, and the level of certainty that witness

demonstrated at the confrontation) to the facts of this case.

Agent Marti testified that, on the date the cocaine was

discovered, February 8, 1991, Rivera described the suspect as

"white" and approximately five feet, two inches tall.

Rivera's testimony at the suppression hearing and Agent

Dania's trial testimony revealed that during his February 11,

1991, interview with Agent Dania, Rivera again described her

as "white." It was not until after the February 16, 1991,

showup that Rivera described the suspect as having "light

6. It is clear from the record that Rivera had ample time
(at least five minutes) to view the suspect on the date the
arrangements were made to ship the purported detergent, that
he paid some degree of attention to the person at the time,
and that eight days between the date of the cocaine shipment
and the showup was not unreasonable.

-14-
14

brown" skin.7 Moreover, Rivera also failed to provide an

accurate description of her height (five feet, six inches) at

either of his pre-showup descriptions.8

The record also contains uncontroverted evidence

that, despite having been asked at the February 16, 1991,

showup to signal the agents when he positively identified Eva

Rios, Rivera waited until after she approached the agents and

began speaking with them (as scheduled) to signal. We hardly

think that this constitutes a high degree of certainty on

Rivera's part, particularly in light of the showup procedure

at issue here. Prior to that showup, Rivera was informed

that the agents were meeting the suspect in front of the

customs building at a specific time. While a few other women

also may have walked by the customs building that morning,

only Eva Rios stopped to speak with the agents.9

7. Accordingly, the district court's finding that there was
"no significant difference" between Rivera's pre-showup and
post-showup descriptions of the suspect is clearly erroneous.

8. During the suppression hearing, Agent Marti -- who is
approximately five feet, seven inches tall -- testified that,
on February 8, 1991, Rivera described the suspect as being "a
little bit more or less like my [Agent Marti] height." At
trial, however, he admitted that, on February 8, 1991, Rivera
described the suspect as five feet, two inches tall.

9. Our analysis of the reliability of Rivera's
identification is further informed by the undisputed evidence
that the government seized Rivera's boat, his only source of
livelihood, on the date of the crime, and informed him that
he would receive it only after their investigation was
completed. The record also reveals that the government
returned his boat less than a week after his positive
identification of Eva Rios. We think that these facts, when

-15-
15

Based upon the above analysis, therefore, we find

that Rivera's pretrial identifications were both

impermissibly suggestive and unreliable. And, as this is not

a case of "minimal suggestivity . . . [that could have been]

cured at trial," Maguire, 918 F.2d at 264 (emphasis

supplied), we conclude that his identification testimony

should have been kept from the jury.

Our inquiry does not, however, end here. We must

now determine whether the district court's error was

"harmless beyond a reasonable doubt." Arizona v. Fulminante,

111 S. Ct. 1246, 1265 (1991). Outside of Rivera's testimony,

the only other evidence linking Eva Rios to the crime was the

testimony of Mejias, Rivera's brother-in-law and former

employee. Mejias testified that he spoke with the suspect

for approximately fifteen minutes on February 7, 1991, the

day before the crime. He spoke with her again the next

morning when she inquired about Rivera's whereabouts, and

witnessed the subsequent conversation between her and Rivera.

He gave descriptions of her on February 8, 12, 25, and during

his trial testimony. Despite having described her skin color

as "white" on both February 8 and 12, he selected her picture

on February 25, from a photo spread with photos of five other

women with similar characteristics. Also on that date, he

placed alongside the one-person showup and Rivera's belated
identification, cast serious further doubt on the reliability

of that identification.

-16-
16

described her as having "light brown skin." Additionally,

during his trial testimony, he identified her in court as the

woman he spoke with on February 7 and 8.

Although the harmless error question is close, we

cannot conclude -- under the particular circumstances of this

case -- that the error was harmless beyond a reasonable

doubt. First, there is no way for us to discern the role

that Rivera's identification played in the jury's

deliberations. We are concerned that the jury may have been

persuaded to convict by the very fact that there were two

witnesses who identified Eva Rios. It is also possible that

the jury relied solely upon the testimony of Rivera in

reaching its conclusion. Thus, we find reasonable doubt

exists as to whether the jury would have convicted Eva Rios

based solely upon Mejias's identification testimony.10 See

Clark v. Moran, 942 F.2d 24, 27 (1st Cir. 1991) ("there must

10. We note that there exists at least some basis for
questioning Mejias's testimony that his photo-spread and in-
court identifications of Eva Rios were not influenced by
Rivera's showup identification. Mejias and Rivera were
brothers-in-law of more than thirty years who worked together
on Rivera's boat. Despite their close relationship, Mejias
testified that he had no contact with Rivera between February
8, 1991, (the date on which he and Rivera described the
suspect as having "white" skin), and February 25, 1991, (the
date on which they both described the suspect as having
"light brown" skin and selected Eva Rios's picture from a
photo-spread). This testimony, coupled with the fact that
Mejias offered no explanation as to what caused him to change
his description of the suspect, may well have led the jury to
doubt his credibility on this critical question.

-17-
17

be `no reasonable doubt' that the jury would have reached the

same verdict without having received the tainted evidence")

(quoting Milton v. Wainwright, 407 U.S. 371, 377 (1972)).

Cf. Coppola v. Powell, 878 F.2d 1562, 1571 (1st Cir.)

(holding no harmless error where improperly admitted evidence

"may have been the clincher" in the jury's deliberations),

cert. denied, 493 U.S. 969 (1989).

Finally, this is not a case of "overwhelming

evidence of guilt." Wainwright, 407 U.S. at 377; Moran, 942

F.2d at 27. Indeed, the entire case against Eva Rios

depended upon the jury's having credited the Rivera and

Mejias identifications and rejected her alibi defense.11

Under these circumstances, we cannot say that the district

court's error was harmless beyond a reasonable doubt. Cf.

Coppola, 878 F.2d at 1571 (holding no harmless error despite

finding that independent evidence indicated it was "probable

that [defendant] committed the crime"). Accordingly, Eva

Rios's conviction cannot stand.12

B. Sufficiency of the Evidence Against Jose Rios

11. Our harmless error analysis might be different had the
government's case against Eva Rios included the testimony of
the confidential informant, the two men who delivered the ten
boxes of purported detergent to the boat, an eyewitness who
was not a potential suspect in the case, or some physical
evidence linking her to the crime.

12. We need not address, therefore, Eva Rios's alternative
argument that the evidence was insufficient to convict her.

-18-
18

Jose Rios asserts that there was insufficient

evidence to find him guilty of aiding and abetting in the

violation of 21 U.S.C. 952(a)13 (importation of cocaine),

and 21 U.S.C. 841(a)(1)14 (possession with intent to

distribute cocaine). As such, he argues that the district

court erroneously denied his Rule 29(a) motions for judgment

of acquittal.

"In reviewing a properly preserved Rule 29 motion,

we examine the evidence and all legitimate inferences

therefrom in the light most favorable to the government to

determine whether a rational jury could have found guilt

beyond a reasonable doubt." United States v. Morales-

Cartagena, Nos. 91-2079, 2080, slip op. at 2 (1st Cir.

February 23, 1993) (emphasis added). See also United States

v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993) (To uphold a

conviction, the court must "satisfy itself that the guilty

verdict finds support in `a plausible rendition of the

record.'") (quoting United States v. Ortiz, 966 F.2d 707, 711

(1st Cir. 1992), cert. denied, 113 S. Ct. 1005 (1993)). In

making this determination, the court must resolve all

13. 21 U.S.C. 952(a) provides that it "shall be unlawful
to import into the customs territory of the United States
from any place outside thereof (but within the United States)
. . . [a] controlled substance . . . ."

14. 21 U.S.C. 841(a)(1) provides that it "shall be
unlawful for any person knowingly or intentionally" to
"possess with intent . . . to distribute . . . a controlled
substance . . . ."

-19-
19

credibility issues in favor of the verdict. United States v.

Nueva, 979 F.2d 880, 883 (1st Cir. 1992), cert. denied, 1993

WL 38626 (U.S. March 22, 1993) (No. 92-7536).

To prove a violation of 21 U.S.C. 952(a), the

government must show beyond a reasonable doubt that a

defendant knowingly or intentionally imported, or caused to

be imported, a controlled substance into the customs

territory of the United States. See United States v.

Alvarado, 982 F.2d 659, 663 (1st Cir. 1992). See also United

States v. Ocampo-Guarin, 968 F.2d 1406, 1409 n.2 (1st Cir.

1992) ("This statute `requires little else but a showing that

a defendant has knowingly brought a controlled substance with

him from abroad into the United States.'") (quoting United

States v. McKenzie, 818 F.2d 115, 118 (1st Cir. 1987)).

"Criminal intent may, of course, be inferred from

circumstantial evidence." Morales-Cartagena, slip op. at 5.

To prove a violation of 21 U.S.C. 841(a)(1), the

government must show beyond a reasonable doubt that a

defendant knowingly or intentionally possessed a controlled

substance with intent to distribute it. United States v.

Gomez-Villamizar, 981 F.2d 621, 624 (1st Cir. 1992). A

defendant can be found guilty under this statute if s/he

merely has constructive possession of the controlled

substance. Id. The quantity of drugs involved is sufficient

to create an inference that a defendant knew that it would be

-20-
20

distributed. Id. See also United States v. Vargas, 945 F.2d

426, 428-29 (1st Cir. 1991) (holding that possession of one

kilogram of cocaine is enough to support inference of intent

to distribute).

Jose Rios argues that the evidence was insufficient

because (1) the government failed to prove that he made any

contacts with the person who sent the cocaine prior to its

shipment, and (2) the only evidence linking Jose Rios to the

crime was his presence at the dock in Fajardo. Unfortunately

for appellant, these arguments fall well short of the mark.

Evidence in the record supports an inference that

Jose Rios did have contact with the sender prior to the

shipment. For instance, the sender instructed Rivera to fill

in the name of "Papo Rios" on the receipt as the individual

who would receive the shipment. Testimony revealed that Jose

Rios also went by the name of "Papo Rios." And, Jose Rios

was the individual who greeted Rivera on the dock in Fajardo

to pick up the ten boxes. Further, despite having disclaimed

ownership of the ten boxes, Jose Rios signed the customs

document as the "owner" of the ten boxes.

Jose Rios's defense turned upon the jury believing

his story about having been duped by his cousin Evaristo

Rios. Unfortunately for him, it appears that the jury found

his story unpersuasive. Having carefully reviewed the

-21-
21

record, we think that there is ample evidence to support his

conviction. Accordingly, we do not disturb it.

III.

Conclusion

In sum, for the reasons herein stated, we vacate

the judgment of conviction as to Eva Rios, and affirm the

judgment of conviction as to Jose Rios.

In Appeal No. 91-1933, the judgment of conviction

is vacated and the case is remanded for further proceedings

not inconsistent with this opinion.

In Appeal No. 91-1860, the judgment of conviction

is affirmed.

-22-
22